[No. H037545. Sixth Dist. Feb. 19, 2013.]

HABITAT AND WATERSHED CARETAKERS, Plaintiff and Appellant, v. CITY OF SANTA CRUZ et al., Defendants and Respondents; THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, Real Party in Interest and Respondent.

1278

COUNSEL

Law Offices of Stephan C. Volker, Stephan C. Volker and Stephanie L. Abrahams for Plaintiff and Appellant.

Remy Moose Manley, James G. Moose, Sabrina V. Teller and Jeannie Lee for Defendants and Respondents.

Charles F. Robinson and Kelly Lynne Drumm for Real Party in Interest and Respondent.

OPINION

**MIHARA, J.**—Appellant Habitat and Watershed Caretakers (Habitat) challenges the trial court's denial of its mandate petition. Habitat's petition contended that respondent City of Santa Cruz (the City) had failed to comply with the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.). The City had certified an environmental impact report (EIR) for a project to seek an amendment of the City's sphere of influence (SOI) to include an undeveloped portion of the University of California, Santa Cruz (UCSC), campus known as "North Campus" so as to permit the City to provide extraterritorial water and sewer services to proposed new development in North Campus.

An SOI is "a plan for the probable physical boundaries and service area of a local agency, as determined by the [local agency formation commission]." (Gov. Code, § 56076.) The Legislature has vested each county's local agency formation commission (LAFCO) with the power and duty to "approve with or without amendment, wholly, partially, or conditionally, or disapprove" a city's request for an SOI amendment. (Gov. Code, § 56428, subd. (e).) LAFCO's authority over a city's SOI is guided by, among other factors, the capacity and adequacy of the services that the city has the ability to provide. (Gov. Code, § 56425, subd. (e)(3).) LAFCO also controls a city's authority to provide services outside its jurisdictional limits. (Gov. Code, § 56375, subd. (p).) "A city or district may provide new or extended services by contract or agreement outside its jurisdictional boundaries only if it first requests and receives written approval from [LAFCO]." (Gov. Code, § 56133, subd. (a).) LAFCO "shall approve, disapprove, or approve with conditions the contract for extended services." (Gov. Code, § 56133, subd. (d).) With certain exceptions not relevant here, a city may provide such services outside its jurisdictional boundaries only if the services will be provided "within its sphere of influence in anticipation of a later change of organization." (Gov. Code, § 56133, subd. (b).) The City's project therefore required LAFCO approval of both the City's application for the SOI amendment and a concurrent application by real party in interest The Regents of the University of California (the Regents) for approval of its agreement with the City for extraterritorial water and sewer services for North Campus.

Habitat asserts that the City's environmental review of the project violated CEQA. It argues that the EIR (1) did not adequately discuss and analyze the impacts of the project on water supply, watershed resources, biological resources, and indirect growth, (2) misdescribed the project's objectives, (3) failed to consider and analyze a reasonable range of alternatives, and (4) failed to provide adequate mitigation measures. Habitat also maintains that the City failed to make sufficient findings and failed to provide an adequate

statement of overriding considerations. We find no significant inadequacies in the EIR's discussion and analysis of the impacts of the project, description of the project's objectives, mitigation measures, findings, and statement of overriding considerations. However, we conclude that the City's EIR was inadequate because it failed to consider and discuss *any* feasible alternative, such as a limited-water alternative, that could avoid or lessen the significant environmental impact of the project on the City's water supply. Consequently, we reverse.

## I. Background

The City has long suffered from a water supply deficit in dry years. It has considered and rejected many alternative sources of water as infeasible, and its current long-term plan is to construct a desalination facility. The City's plans for a desalination facility are in their infancy.

In 2006, the Regents adopted the Long-Range Development Plan 2005–2020 (LRDP) for UCSC. The LRDP contemplated the development of North Campus. North Campus is not within the City's territorial boundaries or SOI. North Campus is in an unincorporated area of the County of Santa Cruz (the County). A CEQA action brought by the City, the County, and other parties challenged the Regents' certification of an EIR for the LRDP and the Regents' adoption of the LRDP.

In August 2008, the City, the Regents, and the other parties to the litigation over the LRDP entered into a comprehensive settlement agreement (the CSA) resolving that action and other litigation concerning UCSC development. Under the CSA, the Regents made various commitments, including restrictions on enrollment and provisions for increasing on-campus housing. The housing commitment was contingent on the City seeking LAFCO approval of an SOI amendment and agreeing not to oppose the Regents' request for extraterritorial water and sewer services for North Campus.[1] The CSA provided that a LAFCO denial would excuse the Regents from the housing commitment.[2]

---

[1] The Regents state that they are not contending in this case that the City is obligated to provide water for North Campus development in the absence of LAFCO approval. The Regents reserved that issue in the CSA for possible future litigation. Because that contention is not being made in this case, we need not consider it.

[2] Section 2.8 of the CSA provided: "UCSC will apply to LAFCO for extraterritorial water and sewer services (for the development of 3,175,000 gross square feet of additional building space under the 2005 LRDP for the service area below the line identified on the map attached hereto as Exhibit A) from the City of Santa Cruz on the following conditions: [¶] a. The City, County, CLUE, et al. and Stevens, et al., do not object to UCSC's reliance on the 2005 LRDP EIR except as provided in [2.8(b), (d), (e), and (f)] and/or the City's Integrated Water Plan EIR, or on any applicable CEQA exemption, in support of its LAFCO application, if

The CSA was incorporated by stipulation into the superior court's September 2008 judgment in the action regarding the LRDP. In October 2008, the City sent a letter to LAFCO informing LAFCO that it had agreed to provide extraterritorial water and sewer services to North Campus. The City filed an application for an SOI amendment with LAFCO, and the Regents filed an application for the provision of extraterritorial water and sewer services. (See *Community Water Coalition v. Santa Cruz County Local Agency Formation Com.* (2011) 200 Cal.App.4th 1317, 1321 [134 Cal.Rptr.3d 899].) While these applications were pending, the City prepared a draft EIR for the project.

The draft EIR found one significant and unavoidable direct impact. "The proposed project would result in future provision of water service to the North Campus portion of the UCSC campus that would support new planned development and growth to the year 2020. There are inadequate water supplies to serve the project under existing and future multiple dry year (drought) conditions."[3] The draft EIR also found that there were other significant secondary impacts, including the impact on biological resources, but it concluded that these other impacts generally could be mitigated to insignificance. Some of the indirect impacts of UCSC growth were found to be unavoidable, but, other than erosion, those impacts are not at issue in this action. The draft EIR noted that "[i]mplementation of the proposed project [providing water and sewer services to North Campus] would enable UCSC to move forward with plans to develop the North Campus" under the LRDP. After receiving and responding to the comments on the draft EIR, the City certified in August 2010 that the final EIR complied with CEQA.

Habitat filed a petition challenging the City's certification of the final EIR. It alleged that the City had violated CEQA because it (1) did not adequately

necessary; and [¶] b. Pursuant to . . . Government Code Section 56425, et seq., the City's Sphere of Influence is amended to include the areas designated in the 2005 LRDP presently exclusively within the County limits (as identified in the map attached hereto as Exhibit A), concurrently with the University's application to LAFCO. Pursuant to Government Code Section 56425, et seq., the City and County will negotiate an agreement for the Sphere of Influence amendment to include the area below the line . . . on the Exhibit A map. This agreement shall be submitted as part of the City's proposed Sphere of Influence amendment concurrently with UCSC's LAFCO application. UCSC shall initiate its LAFCO application concurrent with the City's proposed Sphere of Influence amendment on or before October 28, 2008, unless [UCSC and the City agree to an extension]. In the event the City's Sphere of Influence is not amended or a legal action challenging the amendment is filed, UCSC retains the ability to assert any and all rights or legal positions regarding its ability to develop the North Campus including, but not limited to, the applicability of an exemption or immunity from LAFCO's jurisdiction. Notwithstanding the foregoing, all parties retain the right to assert any and all legal claims or positions regarding any LAFCO decision or UCSC's ability to develop the North Campus . . . ."

[3] The draft EIR also found two significant and unavoidable indirect cumulative impacts. These impacts were the project's contribution to the water supply deficit and to global climate change.

discuss the project's environmental impacts, (2) failed to identify and discuss a reasonable range of alternatives, and (3) failed to propose adequate mitigation measures. Habitat also contended that the City violated CEQA by making inadequate findings and approving an inadequate statement of overriding considerations. The trial court denied the petition. Habitat timely filed a notice of appeal.

## II. Discussion

### A. Standard of Review

"We may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable. 'Our limited function is consistent with the principle that "[t]he purpose of CEQA is not to generate paper, but to compel government at all levels to make decisions with environmental consequences in mind. CEQA does not, indeed cannot, guarantee that these decisions will always be those which favor environmental considerations." ' [Citation.] We may not, in sum, substitute our judgment for that of the people and their local representatives. We can and must, however, scrupulously enforce all legislatively mandated CEQA requirements." (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564 [276 Cal.Rptr. 410, 801 P.2d 1161] (*Goleta II*).)

Judicial review of an agency's decision to certify an EIR and approve a project "shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (Pub. Resources Code, § 21168.5; see *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392, fn. 5 [253 Cal.Rptr. 426, 764 P.2d 278] (*Laurel Heights*).) "Noncompliance with substantive requirements of CEQA or noncompliance with information disclosure provisions 'which precludes relevant information from being presented to the public agency . . . may constitute prejudicial abuse of discretion within the meaning of Sections 21168 and 21168.5, regardless of whether a different outcome would have resulted if the public agency had complied with those provisions.' (§ 21005, subd. (a).) In other words, when an agency fails to proceed as required by CEQA, harmless error analysis is inapplicable. The failure to comply with the law subverts the purposes of CEQA if it omits material necessary to informed decisionmaking and informed public participation." (*County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 946 [91 Cal.Rptr.2d 66].)

## B. Assessment of Impacts

Habitat contends that the final EIR did not adequately assess the environmental impact of the project on water supply, watershed resources, biological resources, and indirect growth.

### 1. Water Supply

#### a. Background

The draft EIR extensively described the City's water supply situation. The City currently has four "primary water sources." Three coastal streams and a natural spring on the North Coast provide almost a quarter of the City's water. Nearly half of the City's water comes from diversions from the San Lorenzo River, a source which the City shares with other water districts, private water companies, and individual property owners along the river. These diversions are restricted to protect fish habitat. Loch Lomond Reservoir, which collects water from the Newell Creek watershed, supplies close to a quarter of the City's water. The City must share this water with another water district, and the City's withdrawals are limited. A very small amount of the City's water supply comes from wells in Live Oak, which play an important role because they can be drawn upon when supplies of surface water are limited. However, these wells draw from a groundwater basin in which water levels are dropping and that is at risk of saltwater intrusion.

All of the City's existing water sources face threats in the future. The amount of water available to the City from the North Coast streams and spring, and from the San Lorenzo River, may be restricted in the future as a result of a Habitat Conservation Plan (HCP) currently being prepared. Legal issues potentially threaten the City's supply of water from Loch Lomond Reservoir. Production from the Live Oak wells is threatened by overpumping from the aquifer. Climate change may also threaten all of these water sources.

The City's water sources produce at most 4,400 mgy (million gallons per year). However, their production fluctuates, and it can be as low as 3,400 mgy. Annual net water demand, on the other hand, averages between 3,900 mgy and 4,000 mgy and is projected to steadily increase through 2020. While the City's forecasts vary, demand will likely exceed 4,350 mgy by either 2020 or 2030. If the City's water supply does not decrease, demand is expected to exceed supply in normal (nondrought) years sometime between 2015 and 2020 or possibly not until 2025.

"The City's water supply has limited capacity to serve additional users under normal conditions and has insufficient supplies to meet existing

demand under drought conditions." In 2006, the City's water system was operating at 93 percent of capacity. "A significant shortage occurs on average about 1 out of every 10 years." During a two-year drought, the City's water supplies are woefully insufficient, with its supplies estimated to be able to serve only half of demand.

Over the last 20 years, the City has considered and studied various options for increasing water supply and reducing demand. Many options have been examined and found to be infeasible or of very limited utility. In 2005 and 2006, the City adopted both an Urban Water Management Plan (UWMP) and an Integrated Water Plan (IWP). These plans settled on three strategies: (1) conservation; (2) curtailment (restrictions or rationing) in times of shortage; and (3) construction of a seawater desalination facility. The City is proceeding with plans for a desalination facility, but has not yet engaged in project-level environmental review for that proposed project, which would require numerous approvals and permits from other agencies. The City sees a desalination facility as its "only feasible alternative" and "only practical solution" for increasing its water supply. However, the City has "conclude[d] that it cannot 'confidently determine' that this source is 'reasonably likely,' as spelled out in the guidance provided by the California Supreme Court in its decision in *Vineyard Area Citizens et al. v. City of Rancho Cordova* (2007) 40 Cal.4th 412 [53 Cal.Rptr.3d 821, 150 P.3d 709]." A desalination facility is nonetheless "considered to be the most likely future water source, although it nonetheless remains somewhat uncertain until design, environmental review and regulatory approvals are completed." The proposed desalination facility would be shared with another water district. The environmental impacts of the construction of the proposed desalination facility were addressed in the City's program-level EIR for the IWP in 2006.

UCSC is currently the "largest water customer" in the City's service area. In 2007, UCSC used approximately 200 mgy, after using 205 mgy in 2005. If UCSC develops North Campus, its water demand is expected to increase to approximately 340 mgy by 2020. The City prepared a Water Supply Assessment (WSA) for the Regents' North Campus development project. The City concluded that development of North Campus would require only an additional 100 mgy by 2020, in part because it assumed that UCSC would reduce its overall usage by 15 percent through conservation measures. An additional 26 or 38 mgy would be used by UCSC in 2020 in other areas (not North Campus) for a total UCSC usage of 338 mgy in 2020.

Although the draft EIR acknowledged that the impact of the project on the City's water supply was a "potentially significant impact," it concluded that the City had adequate supply to serve the project in normal years and would fall short only in dry years. This assessment was based in part on the

assumption that the City's water demand growth rate would be low (0.4 percent) rather than high (0.8 percent). The City would have a shortfall in 2025 of 42 mgy in normal years if the growth rate was 0.8 percent, which was what was projected. In dry years, the City would have a shortfall regardless of the growth rate and even without the project's increased water demand. The magnitude of such a shortfall (over 1,500 mgy) would dwarf the demand required by the project (100 mgy).

### b. Analysis

Habitat's challenge to the adequacy of the City's analysis of water supply impacts is based on *Santiago County Water Dist. v. County of Orange* (1981) 118 Cal.App.3d 818 [173 Cal.Rptr. 602] (*Santiago*) and *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova, supra*, 40 Cal.4th 412 (*Vineyard*).

*Santiago* is readily distinguishable. In *Santiago*, a water district challenged an EIR for a mining operation in its district. (*Santiago, supra*, 118 Cal.App.3d at p. 822.) The Court of Appeal found that the EIR provided inadequate information about water supply in two respects. (*Santiago*, at p. 829.) It did not provide information about the facilities that would be needed to deliver water to the mining operation "or facts from which to evaluate the pros and cons of supplying the amount of water that the mine will need." (*Ibid.*) Instead of analyzing the impact that supplying water to the mining operation would create, the EIR simply stated, incorrectly, that the district had indicated its ability to supply the water. (*Santiago*, at pp. 830–831.) The EIR was also "silent about the effect of that delivery on water service elsewhere in the Water District's jurisdiction." (*Santiago*, at p. 831.) The Court of Appeal concluded that the EIR lacked "information about how adverse the adverse impact will be." (*Ibid.*)

Here, the draft EIR did not suffer from the infirmities identified by the Court of Appeal in *Santiago*. It carefully described the impact that supplying water to North Campus would have on the City's ability to meet the demands of its existing users. While the City's supply was already inadequate, the draft EIR explained that the impact of supplying an additional 100 mgy for the North Campus development would be just a small part of the overall impact on the City's existing users of the City's inadequate water supply. The City's water supply will fall short in drought years regardless of the project and will fall short in normal years in the near future also regardless of the project. The draft EIR acknowledged that supplying water to North Campus will contribute to the shortfall and provided estimates of the size of both North Campus's water needs and the shortfall that the City faced so that the merits of the project could be evaluated from a water supply standpoint. This discussion in the draft EIR was not inadequate in these respects.

■ The Habitat's reliance on *Vineyard* is more substantive. In *Vineyard*, an EIR for the community and specific plans for a large development was challenged under CEQA on the ground that it failed to adequately "identify and evaluate future water sources for the development." (*Vineyard, supra,* 40 Cal.4th at p. 421.) The issue was "how firmly future water supplies for a proposed project must be identified or, to put the question in reverse, what level of uncertainty regarding the availability of water supplies can be tolerated in an EIR for a land use plan." (*Vineyard,* at p. 428.) The California Supreme Court identified four "principles for analytical adequacy under CEQA." (*Vineyard,* at p. 430.) First, an EIR is inadequate if it "simply ignores or assumes a solution to the problem of supplying water to a proposed land use project. Decision makers must, under the law, be presented with sufficient facts to 'evaluate the pros and cons of supplying the amount of water that the [project] will need.' " (*Vineyard,* at pp. 430–431, quoting *Santiago, supra,* 118 Cal.App.3d at p. 829.) Second, "future water sources for a large land use project and the impacts of exploiting those sources are not the type of information that can be deferred for future analysis. An EIR evaluating a planned land use project must assume that all phases of the project will eventually be built and will need water, and must analyze, to the extent reasonably possible, the impacts of providing water to the entire proposed project." (*Vineyard,* at p. 431.) "Third, the future water supplies identified and analyzed must bear a likelihood of actually proving available; speculative sources and unrealistic allocations ('paper water') are insufficient bases for decisionmaking under CEQA. [Citation.] An EIR for a land use project must address the impacts of *likely* future water sources, and the EIR's discussion must include a reasoned analysis of the circumstances affecting the likelihood of the water's availability. [Citation.]" (*Vineyard,* at p. 432.) "Finally, where, despite a full discussion, it is impossible to confidently determine that anticipated future water sources will be available, CEQA requires some discussion of possible replacement sources or alternatives to use of the anticipated water, and of the environmental consequences of those contingencies. [Citation] . . . [W]hen an EIR makes a sincere and reasoned attempt to analyze the water sources the project is likely to use, but acknowledges the remaining uncertainty, a measure for curtailing development if the intended sources fail to materialize may play a role in the impact analysis." (*Ibid.*)

■ The *Vineyard* court noted that the EIR was not obligated to provide "certainty." "Requiring certainty when a long-term, large-scale development project is initially approved would likely be unworkable, as it would require water planning to far outpace land use planning." (*Vineyard, supra,* 40 Cal.4th at p. 432.) "[T]he burden of identifying likely water sources for a project varies with the stage of project approval involved; the necessary degree of confidence involved for approval of a conceptual plan is much lower than for

issuance of building permits. The ultimate question under CEQA, moreover, is not whether an EIR establishes a likely source of water, but whether it adequately addresses the reasonably foreseeable *impacts* of supplying water to the project. If the uncertainties inherent in long-term land use and water planning make it impossible to confidently identify the future water sources, an EIR may satisfy CEQA if it acknowledges the degree of uncertainty involved, discusses the reasonably foreseeable alternatives—including alternative water sources and the option of curtailing the development if sufficient water is not available for later phases—and discloses the significant foreseeable environmental effects of each alternative, as well as mitigation measures to minimize each adverse impact." (*Vineyard*, at p. 434.) The court held that the EIR in question was inadequate because it failed to explain how long-term water demand for the development was likely to be satisfied from the sources it identified and failed to discuss the environmental impact of utilizing these sources and how those impacts could be mitigated. (*Vineyard*, at p. 421.)

 Habitat claims that the draft EIR failed to demonstrate that the water required for the development of North Campus "was available" and failed to discuss the environmental consequences of proceeding with the project without adequate water supplies, including the impact on "imperiled salmonids" that depend on the City's existing water sources.[4] An EIR is not required to "establish[] a likely source of water," but may satisfy CEQA by "address[ing] the reasonably foreseeable *impacts* of supplying water to the project," "acknowledg[ing] the degree of uncertainty involved, discuss[ing] the reasonably foreseeable alternatives," and "disclos[ing] the significant foreseeable environmental effects of each alternative, as well as mitigation measures to minimize each adverse impact." (*Vineyard, supra,* 40 Cal.4th at pp. 432-434.) The draft EIR did so. It discussed the impact of the project on the City's water supply, acknowledged the City's inadequate supplies, and noted that the construction of a desalination facility, the City's only feasible source of additional water supply, was uncertain. Throughout the draft EIR, the City acknowledged that the impact of the project's water demand would increase the ongoing imbalance between the City's supplies and the demands of its users. Nevertheless, the City projected that this imbalance could be dealt with through conservation and curtailment, and, hopefully, could be remedied if the City's plans for a desalination facility came to fruition. Obviously,

---

[4] Habitat also contends that the final EIR should have discussed the impact of the project on the City's existing water users. The draft EIR discussed the impact of the project on the City's existing water users. "[P]roject water demand during the peak season in dry years . . . could result in additional per connection curtailments of 11 gpd [gallons per day] than it otherwise would have been reached." The final EIR revised this discussion to reduce the impact to 10.5 gpd (gallons per day). In other words, the project's water demand could cause each existing water connection to lose access to approximately 11 gallons of water per day during the peak season of dry years.

curtailment is a harsh response to an inadequate water supply. If conservation proves inadequate, the City will be forced to calibrate demand to supply by depriving users of water, essentially forcing them to conserve. Nevertheless, as the nature of this harsh reality was discussed and disclosed in the draft EIR, the draft EIR was not inadequate in this respect.

## 2. Watershed Resources

Habitat asserts that the draft EIR was inadequate because it failed to discuss the impact of the development of North Campus on erosion in the Cave Gulch watershed and neglected to "delineate wetlands" in the North Campus area.

The draft EIR addressed the issue of erosion in the Cave Gulch watershed. Relying on the LRDP EIR, the draft EIR acknowledged that "increased runoff from the addition of impervious surfaces within some of the watersheds, including the Cave Gulch watershed, could add to existing erosion problems that are present in those watersheds" and observed that the LRDP EIR had included mitigation measures to reduce that impact to a less than significant level.[5] The LRDP EIR explained that, if project-level review showed that there were additional impacts, further mitigation would be necessary at that time. Development of North Campus would increase impervious surfaces in the Cave Gulch watershed by 54 acres to a total of 61 acres. Due to existing erosion problems, the Regents had developed an "Infrastructure Improvements Project" that was intended to help stabilize the situation before the development of North Campus. Because of steep grades and erosive soils, that project might not be fully effective, so the LRDP EIR included additional mitigation measures "to avoid potential substantial erosion." The draft EIR acknowledged that it was still possible that these measures would be inadequate, and significant erosion would occur.[6]

Habitat does not focus on the draft EIR's discussion of this issue. Instead, it directs our attention to the changes that the final EIR made to this discussion in response to comments on the draft EIR that continued to raise concerns about erosion in the Cave Gulch watershed. The final EIR explained

---

[5] The entire LRDP EIR was included in the administrative record.

[6] Habitat claims *in its reply brief* that the draft EIR and the final EIR were inadequate with regard to Cave Gulch erosion because elsewhere in the draft EIR and the final EIR this erosion was not identified as a significant unavoidable environmental impact of the project. Although Habitat noted in its opening brief that erosion was "not listed" as a "significant and unavoidable impact" in "section 6.0 of the draft EIR," it presented no argument based on that fact. Arguments presented for the first time in an appellant's reply brief are considered waived. (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 763–765 [60 Cal.Rptr.2d 770].) In any case, because the final EIR concluded that this impact would be mitigated to insignificance, any error in this regard was immaterial.

that, after certification of the LRDP EIR, the Regents had received approval of a storm water permit from their Regional Water Quality Control Board (RWQCB) that "requires UCSC to implement a Storm Water Management Plan (SWMP) that reduces the discharge of pollutants in storm water to the maximum extent practicable and protects water quality." The final EIR noted that UCSC's 2008 Storm Water Management Plan (SWMP) "specifies extensive measures for the control of erosion resulting from new development" that would "control[]" erosion in the Cave Gulch watershed and avoid significant impacts. In its responses to comments, the final EIR summarized the relevant portions of the SWMP and explained how it would reduce the impact to less than significant.

■ Habitat contends that the final EIR's reference to the SWMP was improper because that plan itself was not included in the final EIR. "The data in an EIR must not only be sufficient in quantity, it must be presented in a manner calculated to adequately inform the public and decision makers, who may not be previously familiar with the details of the project. '[I]nformation "scattered here and there in EIR appendices," or a report "buried in an appendix," is not a substitute for "a good faith reasoned analysis . . . ." ' [Citation.]" (*Vineyard, supra,* 40 Cal.4th at p. 442.) Reliance "on information not actually incorporated or described and referenced" in the EIR itself violates CEQA. (40 Cal.4th at p. 442.) Here, the draft EIR's discussion of this issue described, referenced, and incorporated analysis and mitigation measures discussed in the LRDP EIR. The final EIR described and referenced the SWMP's relevant provisions as part of its explanation that the SWMP's additional measures would further assist in avoiding erosion in the Cave Gulch watershed. The final EIR's additional analysis of this issue did not deprive the decision makers of information necessary to evaluate the level of impact or the adequacy of the mitigation measures, so it did not violate CEQA.

Habitat also argues that the draft EIR was inadequate because the City "failed to delineate the wetlands within the Project area prior to Project approval." The draft EIR acknowledged the potential existence of wetlands in North Campus. "Seeps, springs and depressional wetlands that may qualify as jurisdictional wetlands occur in the North Campus area, usually in small patches (less than 500 square feet). Drainages associated with seeps and springs occur as narrow linear features in forest or along road margins." It also acknowledged that "[d]evelopment could result in direct and indirect impacts to jurisdictional wetlands, a potentially significant impact," which could include "the loss of isolated wetlands." The draft EIR explained that the LRDP EIR's mitigation measures required predevelopment delineation of wetlands and avoidance of them if possible. Where avoidance was not possible, "wetlands restoration or creation" was required so as to reduce the impact to a less than significant level. The draft EIR concluded that wetlands

delineation was not necessary at this point "because these resources are dynamic and their precise boundaries are likely to change over the 15-year term of the 2005 LRDP. Due to the dynamic nature of aquatic resources, delineations of waters of the U.S. are considered valid to meet requirements under the Clean Water Act for only three to five years from the date of their verification." Therefore, wetlands delineation would occur "within individual project areas at the time that detailed environmental analyses are conducted for each project," in other words, during project-level environmental review.

Habitat relies on a footnote in *Citizens for Quality Growth v. City of Mt. Shasta* (1988) 198 Cal.App.3d 433 [243 Cal.Rptr. 727] (*Citizens*). *Citizens* involved the rezoning of a parcel. The EIR was challenged on the ground that the lead agency had failed to consider as a mitigation measure for the loss of wetlands the potentially feasible measure of restoring or creating wetlands. (*Citizens*, at p. 442, fn. 8.) The lead agency's response was that it was not required to consider this mitigation measure because the Army Corps of Engineers would protect the wetlands by refusing to issue a permit for a harmful project. (*Ibid.*) The court held that the lead agency could not avoid its own CEQA obligation by relying on another public agency to protect the environment. (*Ibid.*)

*Citizens* is not on point. Here, the City incorporated the mitigation measures for wetlands loss that were spelled out in the LRDP EIR into the draft EIR. It did not defer to some future agency's consideration of such mitigation measures. While the City did not itself map the wetlands, these mitigation measures required that they be identified in advance of development and subjected to the identified mitigation measures.

The only other case cited by Habitat on this point is also distinguishable. In *Mira Monte Homeowners Assn. v. County of Ventura* (1985) 165 Cal.App.3d 357 [212 Cal.Rptr. 127], the EIR failed to recognize that the project would pave over a portion of the wetlands. (*Id.* at p. 364.) In contrast, the draft EIR here explicitly recognized the existence of wetlands in North Campus and incorporated mitigation measures designed to protect them.

Habitat has not established that the draft EIR and final EIR violated CEQA with respect to Cave Gulch erosion and North Campus wetlands.

### 3. Biological Resources

Habitat contends that the draft EIR was inadequate because "[t]he City failed to perform the necessary studies and analysis to show that future changes in the City's water supply would not significantly harm biological resources." Habitat maintains that these studies and analyses were necessary

because "it is reasonably foreseeable that the City would draw more water from its existing water sources including the San Lorenzo River and the North Coast Streams" to supply water to North Campus.

The problem with Habitat's contention is that it lacks a connection to the project. While the draft EIR and the final EIR addressed the impact on the City's water supply of the provision of water to North Campus, the City did *not* propose to increase its water supply by drawing more water from its existing sources in order to meet water demand from North Campus. Instead, the City proposed to meet North Campus's water needs by conservation, curtailment, and the possible construction of a desalination facility. None of these methods involves the City drawing more water from its existing sources.

The studies and analyses that Habitat finds absent would have addressed impacts from the City's *current* usage of water from these existing sources. We do not discount the possibility that the City's critical need to supply water to its existing users may lead it in the future to conclude that it needs to draw more water from these existing sources. However, there is no indication in the record that the City plans to do so in order to supply water to North Campus, that is, to serve this project. Thus, while the impact of the City's use of water from these sources is certainly concerning, these existing possible impacts are not impacts of this project, which does not propose to increase the City's draws from these existing sources.

Nor is it true, as Habitat suggests, that the draft EIR ignored the possibility that the City's diversions from the San Lorenzo River and the North Coast streams might be *reduced* in the future. The draft EIR acknowledged the fact that these water sources might be subject to restrictions in the future. These water supply challenges that the City faces in serving its existing users are not significantly impacted by this project, as those challenges exist with or without this project. Consequently, the City was not required in the draft EIR and the final EIR for this project to study the impact of drawing more (or less) water from these sources.

### 4. Indirect Growth Inducement

Habitat claims that the draft EIR failed to address the cumulative impact on the City's water supply of the growth that the project will induce. In particular, Habitat challenges the draft EIR's failure to consider off-campus population growth (induced by the development of North Campus) that will increase water demand within the City.

The draft EIR both acknowledged and considered the impacts of off-campus population growth induced by the project. "The project would also

indirectly result in secondary population growth off campus as related to the increased enrollment and employment planned in the 2005 LRDP." In a section entitled "Secondary Off-Campus Population Growth," the draft EIR estimated the number of future students, faculty, and staff who would live off campus if the project were implemented. These numbers were broken down to those within the City, outside the City but within the County, and outside the County. The draft EIR projected that the project would indirectly result in as many as 2,300 new off-campus City residents creating "a housing unit demand of approximately 525 to 860 units in the City of Santa Cruz." There were 610 new housing units already approved by the City, and the City expected another 325 units to be constructed by 2015. Because the indirect population increase and housing demand was within or nearly within the City's existing projections, and the City's already expected housing units would satisfy this demand, the draft EIR concluded that it would have no significant environmental impact.

"We apply the substantial evidence test to conclusions, findings, and determinations, and to challenges to the scope of an EIR's analysis of a topic, the methodology used for studying an impact, and the reliability or accuracy of the data upon which the EIR relied because these types of challenges involve factual questions." (*City of Long Beach v. Los Angeles Unified School Dist.* (2009) 176 Cal.App.4th 889, 898 [98 Cal.Rptr.3d 137].) While there may be a legitimate basis for disagreement with the City's analysis and conclusions regarding indirect growth, our standard of review requires us to defer to its resolution of these factual questions. Because the draft EIR presented substantial evidence in support of its conclusion that indirect growth would not cause a significant environmental impact, we must defer to its conclusion.

### C. The Project and Its Objectives

Habitat contends that the draft EIR's description of the project's primary objective "is wrong" because the draft EIR stated that the CSA *required* the City to "*provide* water and sewer services to the North Campus," when the CSA actually required the City only to "*initiate a LAFCO application* for an amended SOI . . . ."[7] (Italics added.) Habitat asserts that the City had "no obligation [under the CSA] to *approve* new water to North Campus in any particular quantity." In Habitat's view, "[t]he CSA does not excuse the City from its CEQA duty to assess *whether* it should provide water for North Campus development, and if so, in what quantity and under what conditions and mitigations."

---

[7] Habitat made a similar argument below, which it has refined on appeal.

The City and the Regents respond that they "agree" that the CSA "does not and could not obligate the City to provide water and sewer services to the North Campus area without first performing CEQA review." At the same time, the City and the Regents maintain that the CSA properly "defined the Project objectives, which in turn necessarily limited the range of potentially feasible alternatives and mitigation measures, [but] did not bind the City's discretion to determine whether or not to approve the Project."

The CSA states that the Regents "will apply to LAFCO for extraterritorial water and sewer services (for [North Campus]) from the City of Santa Cruz on the following conditions: [¶] . . . [¶] b. Pursuant to the requirements of Government Code Section 56425, et seq. [(governing LAFCO SOI determinations)], the City's Sphere of Influence is amended to include [North Campus] . . . ." "[T]he City and County will negotiate an agreement for the Sphere of Influence amendment to include [North Campus]. *This agreement shall be submitted as part of the City's proposed Sphere of Influence amendment concurrent with [the Regent's] LAFCO application.*" (Italics added.)

Thus, under the CSA, the Regents "will apply" for extraterritorial services "on the . . . conditions" that LAFCO approves the SOI amendment *and* the City applies for the SOI amendment. The Regents and the City view this provision as creating conditions on *the Regents' obligation* to apply for services, rather than obligations *on the part of the City*, thereby preserving the City's discretion to choose not to apply to LAFCO for an SOI amendment. In their view, the City's obligation to provide these services hinges on its discretionary decision whether to apply for the SOI amendment.

■ Since their interpretation of the CSA is supported by substantial evidence, we must defer to it. (Pub. Resources Code, § 21168.5.) The draft EIR describes the City's project as "the proposed City of Santa Cruz Sphere of Influence amendment request to [LAFCO] to amend [the City's SOI] to include [North Campus] for the purpose of providing extraterritorial water and sewer services." This accurately describes the discretionary decision that was before the City. However, an EIR must consider the "whole" of an action. " 'Project' means *the whole of an action*, which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and that is any of the following: [¶] (1) An activity directly undertaken by *any* public agency . . . ." (Cal. Code Regs., tit. 14, div. 6, ch. 3 (CEQA Guidelines), § 15378, subd. (a), italics added.) Here, while *the City's* decision was whether to propose an SOI amendment, the "whole" of the action included the Regents' request for extraterritorial services and LAFCO's decision on both the proposal and the request. Thus, the EIR was required to consider all of these actions.

 The City acted as the lead agency with regard to this project *by agreement* with LAFCO. Such an agreement is necessary only where two agencies have a "substantial claim to be the lead agency." (CEQA Guidelines, § 15051, subd. (d).) The lead agency is the agency with "principal responsibility for carrying out or approving a project . . . ." (Pub. Resources Code, § 21067.) As the City would be the entity proposing the SOI amendment and providing the services sought by the Regents if LAFCO approved, the City could be viewed as the agency principally responsible for "carrying out" the project. But LAFCO too, as the agency responsible for approving both the Regents' application and the City's proposed SOI amendment, had a credible claim to be the lead agency. By taking on the lead agency role, the City was responsible for preparing an EIR that would enable it to fulfill that role. "When a project is to be carried out or approved by two or more public agencies, the determination of whether the project may have a significant effect on the environment shall be made by the lead agency, and that agency shall prepare, or cause to be prepared by contract, the environmental impact report for the project . . . ." (Pub. Resources Code, § 21165, subd. (a).)

LAFCO remained a " '[r]esponsible agency' " because it was responsible for making a decision on the proposed SOI amendment and the request for extraterritorial services. (Pub. Resources Code, § 21069.) The Regents and the City acknowledge that the EIR was required to provide both City decision makers *and LAFCO decision makers* with information about the environmental consequences of the decisions that they would be making with regard to the whole project. "An environmental impact report is an informational document which, when its preparation is required by this division, shall be considered by *every* public agency prior to its approval or disapproval of a project." (Pub. Resources Code, § 21061, boldface & italics added.) Yet the Regents and the City claim that any inadequacies in the EIR with regard to the information necessary for *LAFCO to make its decisions were forfeited by LAFCO because it did not bring them to the City's attention during the EIR process.*

The City and the Regents premise this argument on CEQA Guidelines section 15096, subdivision (e). That section concerns the duties of a "responsible agency."[8] If this were an action by LAFCO challenging the City's EIR, CEQA Guidelines section 15096 might be relevant, but this is not such an action. This is an action by citizens challenging the City's EIR.

---

[8] It provides in part: "If a responsible agency believes that the final EIR or negative declaration prepared by the lead agency is not adequate for use by the responsible agency, the responsible agency must either: [¶] (1) Take the issue to court within 30 days after the lead agency files a notice of determination; [¶] (2) Be deemed to have waived any objection to the adequacy of the EIR or negative declaration; [¶] (3) Prepare a subsequent EIR if permissible under Section 15162; or [¶] (4) Assume the lead agency role as provided in Section 15052(a)(3)." (CEQA Guidelines, § 15096, subd. (e).)

■ CEQA Guidelines section 15096 does not excuse a lead agency's failure to prepare an EIR that complies with CEQA. "The purpose of an environmental impact report is to provide public agencies *and the public in general* with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project." (Pub. Resources Code, § 21061, italics added.) The fact that LAFCO did not request revisions to the EIR did not excuse the City from complying with CEQA by providing all relevant information to "the public in general" about the project.

To summarize, the whole of the project included not only the City's decision whether to propose an SOI amendment, but also the Regents' application for extraterritorial services, and LAFCO's decision whether to approve, deny, or approve with conditions the proposed SOI amendment and the Regents' application. With this understanding of the project, we proceed to consider Habitat's claim that the project's objectives were misstated.

■ Habitat claims that the draft EIR misdescribed the project's primary objective, resulting in a failure to consider potentially feasible alternatives and mitigations that would have reduced the project's significant environmental impacts. " 'A clearly written statement of objectives will help the lead agency develop a reasonable range of alternatives to evaluate in the EIR and will aid the decision makers in preparing findings . . . . The statement of objectives should include the *underlying purpose* of the project.' " (*In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1163 [77 Cal.Rptr.3d 578, 184 P.3d 709], italics added (*Bay-Delta*).)

The draft EIR stated: "The objective of the project is to implement City of Santa Cruz obligations set forth in the Comprehensive Settlement Agreement with regard to provision of water and sewer services to the UCSC North Campus area, and specifically to amend the City's Sphere of Influence boundaries to include this area to provide such services. The Settlement Agreement was entered as a final judgment of the Santa Cruz Superior Court. Pursuant to this stipulated judgment, the City agreed to continue to provide water service to the campus through its existing water connections to assist UCSC with achieving its on-campus housing commitment set forth in the Settlement Agreement. Furthermore, the City agreed to submit an application to LAFCO to amend its Sphere of Influence to include the project area of the UCSC Campus concurrent with UCSC submitting its own application request to LAFCO for provision of extraterritorial water and sewer service to the North Campus for development of up to 3,175,000 gross square feet of building space in this area as set forth in the 2005 LRDP."

The draft EIR's description of the project's objectives is not supported by substantial evidence. The CSA did not obligate the City to propose an SOI amendment, so the project, proposing an SOI amendment, was not mandated by the CSA. The draft EIR's identification of amendment of the SOI itself as the project's objective did not illuminate the *underlying purpose* of the project. Of course a proposed SOI amendment is aimed at approval of an SOI amendment, but the draft EIR's description of the project's objectives begs the question of why the City would seek an SOI amendment. Since the CSA did not obligate the City to propose an SOI amendment, the draft EIR's description of the project's objectives failed to illuminate the *underlying purpose* of the project but instead only described the *nature* of the project.

The final EIR modified the draft EIR's description of the project's objectives to instead read: "The objectives of the project are: [¶] □ Implementation of the City of Santa Cruz and UCSC commitments set forth in the Comprehensive Settlement Agreement as related to submittal of concurrent applications to LAFCO to facilitate the provision of water and sewer services to the UCSC North Campus area, [¶] □ Amendment of the City's Sphere of Influence boundaries to include portions of the North Campus area of UCSC; and [¶] □ City provision of extraterritorial water and sewer services to portions of the North Campus."

This statement of the project's objectives was more illuminatory. It basically said that the City's purpose was to provide water and sewer services to North Campus in order to trigger the commitments that had been made by the Regents in the CSA.[9] We see no misstatement of the project's objectives in the final EIR's description. While the draft EIR did fail to adequately delineate the project's objectives, the final EIR corrected this problem.

## D. Range of Alternatives

Habitat contends that the draft EIR and the final EIR failed to consider a reasonable range of potentially feasible alternatives because they failed to

[9] The CSA did obligate the City to provide water and sewer services to North Campus *if* LAFCO approved an application by the City for an SOI amendment and the Regents' application. Habitat argues: "Because no environmental review had been performed on the SOI Amendment when the CSA was signed, the City did not—and legally could not—agree to provide any additional water services at that time. Moreover, the LAFCO Act specifically requires compliance with CEQA before LAFCO can consider such an amendment." Because an SOI amendment requires LAFCO approval, the CSA, to which LAFCO was not a party, could not provide that the amendment would occur. Conversely, because the City was a party to the CSA, the CSA could bind the City to provide water and sewer services if an SOI amendment was approved by LAFCO. Whether the City should have conducted a review under CEQA before entering into the CSA and agreeing to provide such services if an SOI amendment was approved is an issue that is not before us as any error in that regard was not timely challenged.

consider any alternative that would have reduced the significant impact of the project on the City's water supply.

The draft EIR introduced its alternatives discussion by stating: "The primary objective of the proposed project is to implement City of Santa Cruz legal obligations to provide water and sewer service to the North Campus of UCSC set forth in the Comprehensive Settlement Agreement. There are no known alternatives to the City provision of these services to the project area, as the City is the sole provider of urban services to the existing developed UCSC campus and surrounding areas within city limits. Any alternatives that alter the provisions of the Comprehensive Settlement Agreement were not considered feasible as they would violate a legal judgment and would require the cooperation of, and negotiation with, numerous agencies and individuals who signed the Agreement, which is not in the City's control, and which the City considers unlikely to occur."

Habitat correctly points out that the CSA did not necessarily obligate the City to provide such services. *If* the City pursued the project, *and LAFCO approved* the project and the Regents' application, then the City was obligated under the CSA to provide the services. Provision of the services was not a certainty since LAFCO could deny the applications or the extent of the services could be restricted by a conditional grant by LAFCO. As LAFCO was not a party to the CSA, there is no action that it could take that would violate the CSA. Because, as discussed earlier, the draft EIR and the final EIR were prepared for both the City and LAFCO to utilize, the alternatives discussion was required to address the feasible options open to both agencies.

The draft EIR analyzed and considered just two alternatives: the no-project alternative, and a modified SOI alternative. It rejected the no-project alternative because it would achieve neither of the project's primary objectives. Habitat does not take issue with this analysis. A denial by LAFCO would not serve the Regents' need for water to develop North Campus and would not trigger the Regents' obligation to honor the housing commitment in the CSA. Under the CSA, "[i]f a final judicial determination upholds a LAFCO denial or reverses a LAFCO approval of the application so that the University is unable to develop [North Campus], UCSC is excused from the housing commitment . . . ."

The draft EIR stated that the modified SOI alternative would require a change in the CSA and would not avoid the significant environmental impacts because all of the areas planned for development would be within the modified SOI. While the first of these statements is questionable, the second is accurate. No environmental impacts would be avoided by excluding from the SOI land that would not be developed. Nevertheless, the draft EIR

identified this alternative as the environmentally superior alternative because it would provide more protection for the land outside the modified SOI.

The draft EIR also mentioned, but did not analyze, two alternatives that it had eliminated from consideration. It stated that it was not considering the alternative of relocating development from North Campus to the Main Campus because, among other reasons, this alternative "does not meet the primary project objective of fulfilling the City's legal obligations under the Comprehensive Settlement Agreement." Because this alternative would necessarily involve LAFCO denying the applications, which the draft EIR noted was equivalent to the no-project alternative, it would not have permitted the City to hold the Regents to the housing commitment, and it would not have provided the Regents with the water needed to develop North Campus. The draft EIR could reasonably eliminate from consideration a proposed alternative that would serve neither of the project's primary objectives. The same is true as to the proposed alternative of redirecting student enrollment to other campuses, which was also essentially a no-project alternative.

The final EIR added consideration of an additional alternative of annexation rather than extraterritorial services. The final EIR noted that the legal method by which services would be provided would not affect the environmental impacts, so this alternative was not environmentally superior.

■ "The core of an EIR is the mitigation and alternatives sections. The Legislature has declared it the policy of the State to 'consider alternatives to proposed actions affecting the environment.' [Citations.] . . . [¶] In determining the nature and scope of alternatives to be examined in an EIR, the Legislature has decreed that local agencies shall be guided by the doctrine of 'feasibility.' '[I]t is the policy of the state that public agencies should not approve projects as proposed if there are *feasible alternatives* or *feasible mitigation measures* available which would substantially lessen the significant environmental effects of such projects . . . . [I]n the event specific economic, social, or other conditions make infeasible such project alternatives or such mitigation measures, individual projects may be approved in spite of one or more significant effects thereof.' [Citation.]" (*Goleta II, supra,* 52 Cal.3d at pp. 564–565.)

■ "CEQA establishes no categorical legal imperative as to the scope of alternatives to be analyzed in an EIR. Each case must be evaluated on its facts, which in turn must be reviewed in light of the statutory purpose. . . . [A]n EIR for any project subject to CEQA review must consider a reasonable range of alternatives to the project, or to the location of the project, which: (1) *offer substantial environmental advantages over the project proposal* (Pub. Resources Code, § 21002); and (2) may be 'feasibly accomplished in a

successful manner' considering the economic, environmental, social and technological factors involved." (*Goleta II, supra*, 52 Cal.3d at p. 566, italics omitted & added.) The EIR "*is* required to make an in-depth discussion of those alternatives identified as at least potentially feasible." (*Sierra Club v. County of Napa* (2004) 121 Cal.App.4th 1490, 1505, fn. 5 [19 Cal.Rptr.3d 1].)

"An EIR's discussion of alternatives must contain analysis sufficient to allow informed decision making. [Citation.] [¶] . . . [¶] . . . Without meaningful analysis of alternatives in the EIR, neither the courts nor the public can fulfill their proper roles in the CEQA process. . . . 'To facilitate CEQA's informational role, the EIR must contain facts and analysis, not just the agency's bare conclusions or opinions.' [Citations.] An EIR must include detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project." (*Laurel Heights, supra*, 47 Cal.3d at pp. 404–405.)

■ "It is the [agency]'s responsibility to provide an adequate discussion of alternatives. (Guidelines, § 15126, subd. (d).) That responsibility is not dependent in the first instance on a showing by the public that there are feasible alternatives. If the [agency] concludes there are no feasible alternatives, it must explain in meaningful detail in the EIR the basis for that conclusion." (*Laurel Heights, supra*, 47 Cal.3d at p. 405.) The "failure to raise the specific alternatives during the comment period would not necessarily have warranted a decision to exclude the [alternatives] altogether from consideration, particularly if they had appeared to represent reasonable project alternatives." (*Goleta II, supra*, 52 Cal.3d at p. 568.) "[A]n EIR should not exclude an alternative from detailed consideration merely because it 'would impede to some degree the attainment of the project objectives.' [Citation.] But an EIR need not study in detail an alternative that is infeasible or that the lead agency has reasonably determined cannot achieve the project's underlying fundamental purpose." (*Bay-Delta, supra*, 43 Cal.4th at p. 1165.)

Habitat argues that the draft EIR and final EIR alternatives discussions were inadequate because they failed to consider *any* alternatives that would avoid some of the significant environmental impacts of the project. What was missing, Habitat maintains, was analysis of a "reduced-development" or "limited-water" alternative.

We reject at the outset Habitat's claim that the City was required to analyze a "reduced-development" alternative. "A [LAFCO] shall not impose any conditions that would *directly regulate* land use density or intensity, property development, or subdivision requirements." (Gov. Code, § 56375,

subd. (a)(6), italics added.) Because LAFCO lacks the power to impose conditions that would directly restrict the Regents' development of North Campus, a reduced development condition was not an available alternative.

The City and the Regents argue that any discussion of a limited-water alternative was properly omitted because (1) it would not "meet the basic Project objective," (2) it would not avoid the significant impact on water supply because the Regents could develop areas already within the City's water service area, and (3) "the City has no jurisdiction to limit UCSC's on-campus development."

The City and the Regents do not specify which "basic Project objective" would be unmet by a limited-water alternative. A limited-water alternative would partially meet the project's objectives by allowing some development of North Campus and would not fail to secure the City's ability to hold the Regents to their housing commitment in the CSA if it were selected by LAFCO as a condition of its approval of the project. Consequently, a limited-water alternative could not be eliminated from consideration solely because it would impede to some extent the attainment of the project's objectives.

We find no merit in the conclusory argument by the City and the Regents that there was no need to mention, discuss, or analyze a limited-water alternative because it would not avoid the significant impact on water supply. They reason that this alternative would simply result in the Regents developing areas other than North Campus that are already within the City's water service area. In their view, "[a]nalyzing [a limited-water] alternative in detail would be a futile exercise because it would not provide meaningful information to the City decision-makers regarding whether to approve the Project or an alternative."

" 'To facilitate CEQA's informational role, the EIR must contain facts and analysis, not just the agency's bare conclusions or opinions.' " (*Laurel Heights, supra*, 47 Cal.3d at p. 404.) A potentially feasible alternative that might avoid a significant impact must be *discussed* and *analyzed* in an EIR so as to provide information to the decision makers about the alternative's potential for reducing environmental impacts. Without analysis, the theory posited by the City and the Regents is purely speculative and is not supported by any facts discussed in the draft EIR or the final EIR. Since, as Habitat points out, the draft EIR and the final EIR neither discussed nor analyzed a limited-water alternative, the decision makers were not provided with any information about the effect that such an alternative might have on water supply impacts or other impacts.

CEQA does not permit a lead agency to omit any discussion, analysis, or even mention of *any* alternatives that feasibly might reduce the environmental impact of a project on the *unanalyzed theory* that such an alternative *might not* prove to be environmentally superior to the project. The purpose of an EIR is to provide the facts and analysis that would support such a conclusion so that the decision maker can evaluate whether it is correct. By failing to mention, discuss, or analyze any feasible alternatives, the draft EIR and the final EIR failed to satisfy the informational purpose of CEQA, which included providing LAFCO with relevant information.

The final claim by the City and the Regents lacks merit. The restriction on LAFCO's power to directly regulate land use does not prohibit LAFCO from conditioning the provision of water and sewer services for North Campus development on water supply availability by imposing a limited-water condition. For instance, LAFCO could condition provision of water for North Campus development on a supply ceiling; no more water could be supplied to North Campus than the amount the City could establish it had decreased demand, through conservation, or increased supply, through the employment of a new source of water.

Because the draft EIR and the final EIR failed to discuss *any* feasible alternative, such as a limited-water alternative, that could avoid or lessen the significant environmental impact of the project on the City's water supply, the alternatives discussions in the draft EIR and the final EIR did not comply with CEQA.

### E. Mitigations

Habitat argues that the draft EIR and the final EIR failed to provide "any specific, certain and enforceable mitigation measures for the Project's significant and allegedly unavoidable impacts on water supply." In Habitat's view, the sole mitigation proposed in the draft EIR and the final EIR was the potential construction of a desalination facility. We disagree.

The draft EIR incorporated numerous mitigation measures from the LRDP EIR. These included "a mitigation measure (UTIL-9I) that states during drought situations, the University will utilize water from its existing supply well in Jordan Gulch for non-potable irrigation uses," and a mitigation measure (UTIL-9G) requiring UCSC to "initiate a feasibility study on measures for utilization of reclaimed water (including rainwater, grey water, cooling tower blowdown water and/or recycled water) in new development" that could be used for "cooling, irrigation, and toilet flushing." The LRDP EIR also included "five mitigation measures that call for implementation of additional water conservation strategies to reduce water demand (UTIL-9A,

9B, 9C, 9E, 9H) and two measures that call for water audits to identify additional feasible measures that can be implemented (UTIL-9D, 9F)." In addition, the CSA included an agreement by the Regents to implement a group of "high priority conservation measures."

These mitigation measures were quite "specific" and "certain." Habitat complains that these measures "were not designed to lessen the impacts of the City's Project Approvals" and "do not address the City's looming water supply shortfall." It is not important who "designed" these measures or for what purpose. What is important is that these measures will reduce the impact of this project on the City's water supply. It was not the purpose of the draft EIR or the final EIR to resolve the City's long-standing water supply deficit. The issue addressed by the draft EIR and the final EIR was the impact of this project, which involved the expansion of *UCSC* water use, on the City's water supply. UCSC conservation measures, its reliance on its own well water during times of drought, and its possible use of reclaimed water have the potential to reduce the impact of the project on the City's water supply by reducing overall demand on the City's water supply.

"[I]n a factual dispute over 'whether adverse effects have been mitigated or could be better mitigated' [citation], the agency's conclusion would be reviewed only for substantial evidence." (*Vineyard, supra,* 40 Cal.4th at p. 435.) Substantial evidence supports the City's determination that these measures will reduce the impact of the project on the City's water supply.

## F. Findings

Habitat contends that the City's findings "fail to address the Project's significant direct and indirect impacts on the City's water supply." A public agency may not approve a project unless it "makes one or more of the following findings with respect to each significant effect: [¶] (1) Changes or alterations have been required in, or incorporated into, the project which mitigate or avoid the significant effects on the environment. [¶] (2) Those changes or alterations are within the responsibility and jurisdiction of another public agency and have been, or can and should be, adopted by that other agency. [¶] (3) Specific economic, legal, social, technological, or other considerations, including considerations for the provision of employment opportunities for highly trained workers, make infeasible the mitigation measures or alternatives identified in the environmental impact report." (Pub. Resources Code, § 21081, subd. (a).) The agency's findings must be supported by substantial evidence. (Pub. Resources Code, § 21081.5.)

The City's findings of fact determined that "[n]one of the [significant environmental] effects [of the project] can be avoided by the adoption of

feasible mitigation measures or alternatives although some can be substantially lessened." The findings then incorporated both a table that summarized the draft EIR and the final EIR discussions of the impacts of the project and those discussions themselves. The findings also identified the impact on the City's water supply, summarized the relevant mitigation measures, and concluded that the impact was unavoidable. The City's findings also repeated much of the alternatives analysis included in the draft EIR and the final EIR and found that the alternatives were infeasible.

Habitat's complaints about the City's findings of fact are essentially a repeat of their challenges to the adequacy of the draft EIR and the final EIR themselves. The findings are inadequate as to the alternatives because the draft EIR and the final EIR failed to consider potentially feasible alternatives, but this is a flaw in the draft EIR and the final EIR, rather than just a flaw in the findings. This contention has no independent merit.

## G. Statement of Overriding Considerations

Habitat challenges the sufficiency of the evidence to support the City's statement of overriding considerations.

■ A statement of overriding considerations is required when a lead agency approves a project that will have significant environmental impacts. The agency must find " 'that specific overriding economic, legal, social, technological, or other benefits of the project outweigh the significant effects on the environment.' [Citation.] '[A]n agency's decision that the specific benefits a project offers outweigh any environmental effects that cannot feasibly be mitigated, while subject to review for abuse of discretion [citation], lies at the core of the lead agency's discretionary responsibility under CEQA and is, for that reason, not lightly to be overturned.' " (*The Flanders Foundation v. City of Carmel-by-the-Sea* (2012) 202 Cal.App.4th 603, 623 [135 Cal.Rptr.3d 221].)

The City's statement of overriding considerations provided six reasons, which the City asserted were each individually sufficient to justify approval of the project despite the significant environmental impact the project will cause.

The first reason provided was that the City would benefit from the project due to "enforceable mitigation measures that reflect commitments in the [CSA] relating to water supply." The CSA required the Regents to implement a number of high priority conservation measures. The City could reasonably conclude that UCSC conservation will assist the City in dealing with its

long-standing water supply deficit by reducing demand. Thus, this reason is supported by substantial evidence.

The second reason was that the City would benefit from the Regents' commitments in the CSA regarding traffic impacts. While one might question trading water for traffic mitigation, the CSA does bind the Regents to various traffic mitigation measures premised on development proceeding in accordance with the LRDP. Hence, there is substantial evidence in the record to support this reason.

The third reason was invalid. It stated that the project would fulfill the City's obligations under the CSA. The CSA did not obligate the City to propose an SOI amendment, obtain approval of an SOI amendment, or cause the approval of the Regents' application for extraterritorial water and sewer services. Therefore, we discount this reason.

The fourth and fifth reasons were that the project would allow the Regents to implement, and assist the Regents in implementing, the LRDP. No explanation was provided as to how this would benefit *the City*, so we discount these reasons also.

The final reason was that, in the absence of the project, the Regents might decide to further develop the main campus, which would cause greater environmental impacts. The City cited the LRDP EIR's findings that such development would have such impacts. We cannot discount this reason, as it appears to be supported by evidence in the record.

Thus, three of the six reasons provided by the City find support in the record, and the City found that each of the reasons was individually sufficient to outweigh the significant impact on the City's water supply. Regardless of whether we would disagree with the City's weighing of these reasons against the environmental impact of the project, our abuse of discretion standard of review requires us to defer to the City's balancing unless it may be deemed arbitrary, which is a much tougher standard than questionable or unreasonable. Under the abuse of discretion standard, the City's decision to favor the identified benefits over the significant environmental impacts of the project must be upheld.

## III. Conclusion

 The City's draft EIR and final EIR adequately discussed and analyzed the impacts of the project, did not prejudicially misdescribe the project's objectives, and contained adequate mitigation measures and findings, and an adequate statement of overriding considerations. Nevertheless,

the City's draft EIR and final EIR were inadequate because they failed to discuss *any* feasible alternative, such as a limited-water alternative, that could avoid or lessen the significant environmental impact of the project on the City's water supply.

## IV. Disposition

The judgment is reversed. On remand, the trial court is directed to vacate its decision and to enter a new judgment granting the petition and directing the City to vacate its certification of the final EIR and approval of the project. Habitat shall recover its costs on appeal.

Elia, Acting P. J., and Márquez, J., concurred.

Petitions for a rehearing were denied March 11, 2013, and the petition of both respondents and real party in interest for review by the Supreme Court was denied May 15, 2013, S209675.