Filed 9/16/15  Backcountry Against Dumps v. San Diego County Bd. of Supervisors CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| BACKCOUNTRY AGAINST DUMPS et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> SAN DIEGO COUNTY BOARD OF SUPERVISORS, <br><br> Defendant and Respondent. | D066135 <br><br><br> (Super. Ct. No. 37-20013-00052926-CU-TT-CTL) |


APPEAL from a judgment of the Superior Court of San Diego County,

Timothy B. Taylor, Judge.  Affirmed.


Law Offices of Stephan C. Volker, Stephan C. Volker, Alexis E. Kreig,

Stephanie L. Clarke and Jamey M.B. Volker for Plaintiffs and Appellants.

Thomas E. Montgomery, County Counsel, and C. Ellen Pilsecker, Chief Deputy

County Counsel, for Defendant and Respondent.

Backcountry Against Dumps and Donna Tisdale (together Appellants) challenged

the certification by the San Diego County Board of Supervisors (Board) of a final

environmental impact report (FEIR) for the amendment to the County General Plan and

Zoning Ordinance relating to wind turbines (Project), claiming the Board's approval of the Project violated the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000, et seq.[1]) in several respects. The superior court disagreed and entered judgment denying Appellants' petition for writ of mandate and dismissing their complaint for declaratory and injunctive relief.

Appellants appeal the judgment, contending the FEIR does not adequately address and analyze the significant environmental impacts of the Project or consider a reasonable range of alternatives. In addition, Appellants maintain the Board did not provide an adequate statement of overriding considerations that was supported by substantial evidence. We determine none of these contentions has merit. Accordingly, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In support of California's climate change initiatives, the Board, in early 2009, launched a process to review its existing regulatory framework for wind turbines. To this end, the Board ultimately approved the Project, described in the FEIR as follows:

> "The project is composed of proposed amendments to the County's Zoning Ordinance related to wind turbines and meteorological testing (MET) facilities.[2] The amendments consist of clarifications, deletions, and revisions to provide an updated set of definitions, procedures, and standards for review and permitting of wind turbines and MET facilities. The proposed project includes

---

[1] Statutory references are to the Public Resources Code unless otherwise specified.

[2] MET facilities are comprised of temporary testing equipment used to determine whether a particular area has adequate wind to support a commercial wind turbine project.

2

allowing a temporary MET facility that complies with the height designator of the zone without a discretionary permit. The proposed project also includes allowing small wind turbines[3] that meet the definition and specifications of the Zoning Ordinance to be developed without a discretionary permit. Although no land use permits would be required, a Zoning Verification Permit would be required prior to issuance of a building permit to verify that each small wind turbine complies with the definition and specifications of the Zoning Ordinance. Large wind turbines, as defined by the Zoning Ordinance,[4] would continue to be subject to Major Use Permit procedures and requirements and would require a separate project-specific environmental review. Amendments to the Zoning Ordinance related to large wind turbines are proposed to bring development parameters up to date with technological changes that affect design standards of wind turbines, as well as to establish a low frequency C-weighted sound-level limit.

"The proposed project also includes a General Plan Amendment (GPA) intended to accomplish the following: (1) modify the Boulevard chapter of the Mountain Empire Subregional Plan (Boulevard Community Plan) to allow large wind turbine projects through the Major Use Permit process; and (2) allow small wind turbine projects in the Borrego Springs Community Plan, but continue to prohibit large wind turbines in areas where viewsheds would be adversely impacted. The potential environmental effects associated with the GPA are included in the project analyzed in this EIR."

Prior to approving the Project, the Board issued a notice of preparation of the EIR for the Project on September 9, 2010. The draft environmental impact report (DEIR) was completed on November 8, 2011. The DEIR described the Project objectives as follows:

---

3 "Small Wind Turbine: A wind turbine with or without a tower, which has a rated capacity of not more than 50 kilowatts that generates electricity primarily for use on the same lot on which the wind turbine is located."

4 "Large Wind Turbine: An installation consisting of one or more wind turbines in which the sum of the blade swept areas of all turbines is greater than 850 square feet."

3

"1. Facilitate the use of renewable wind energy within the County pursuant to existing and future statewide goals

"2. Maximize the production of energy from renewable wind sources to assist the County in furthering federal goals under Section 211 of the Energy Policy Act of 2005

"3. Reduce the potential for energy shortages and outages by facilitating local energy supply

"4. Streamline and clarify the approval process for the development and operation of small wind turbines

"5. Minimize the potential land use conflicts that may arise through the development of wind turbines

"6. Allow the development of small wind turbines without a discretionary permit

"7. Allow temporary MET facilities that comply with the height designator of the zone to be permitted without a discretionary permit

"8. Update regulations for large wind turbines to be consistent with current wind turbine technology and design."

A revised DEIR was issued in April 2012. Several hearings were held before the County Planning Commission and the Board regarding the Project and DEIR throughout 2012. In addition, the public was able to comment on the DEIR and proposed Project.

The FEIR was completed in January 2013. It identifies and discusses the Project's environmental effects. The FEIR also identifies and discusses mitigation measures designed to address the Project's potential impacts. The FEIR considers proposed alternatives and rejects certain alternatives as infeasible. It identifies three potentially feasible alternatives, including the required "[n]o [p]roject" alternative, which it analyzes and evaluates.

4

The Board placed the Project on its agenda for consideration at its May 8, 2013 regular meeting. Several written comments, including materials from Appellants, arrived at the County late in the day on May 7, 2013. The Board heard the matter on May 8, 2013 and considered several documents introduced at that meeting. Ultimately, the Board continued the matter to its May 15, 2013 regular meeting.

On May 15, 2013, the Board certified the FEIR, adopted the related CEQA findings, and adopted the zoning ordinance and General Plan changes for the Project. Additionally, the Board adopted "Findings Regarding Significant Effects." The Board adopted a mitigation monitoring and reporting program and findings that recirculation of the FEIR was not required. Because the Board found that the benefits of the Project outweigh the unavoidable environmental effects, it approved a statement of overriding considerations, which set forth the Project's benefits. The Board filed its notice of determination on May 15 as well.

Appellants[5] subsequently filed a petition for a writ of mandate and complaint for injunctive relief, challenging the Board's approval of the Project and the legality of the FEIR. The Board answered the petition and complaint. After the parties briefed the relevant issues, the matter came for hearing in the superior court. There, the court found that the Board and FEIR complied with CEQA and the petition and complaint were without merit. The court entered judgment in favor of the Board, denying the relief requested by Appellants.

---

[5] The Protect Our Communities Foundation also was a petitioner, but is not a party in this appeal.

5

Appellants timely appealed.

# DISCUSSION

## I

## *STANDARD OF REVIEW*

Review of the FEIR is governed by section 21168.5. While the basic nature of review is in ordinary mandamus, CEQA[6] is unique in that it requires substantial evidence in support of certain evidentiary determinations. Under section 21168.5, the court considers whether there was an abuse of discretion, which is established if the agency has not proceeded in a manner required by law or if the decision is not supported by substantial evidence. (§ 21168.5.)

### A.  Substantial Evidence

Substantial evidence means "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (Guidelines, § 15384, subd. (a).) When a court determines an agency's decision was supported by substantial evidence, it grants greater deference to the agency's substantive factual conclusions. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 393 (*Laurel Heights*).)

Courts presume that the agency's decisions are correct, and the challenger bears the burden of proving the contrary. (*State Water Resources Control Board Cases* (2006)

---

6      CEQA is implemented through certain California regulations. (See Cal. Code Regs., tit. 14, § 15000 et seq.; (Guidelines).)

136 Cal.App.4th 674, 723.) A court "may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable." (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564.) A court " 'must resolve reasonable doubts in favor of the administrative finding and decision' " (*Laurel Heights*, *supra*, 47 Cal.3d at p. 393), even though other conclusions might be reached from the same body of evidence. (*Ibid.*) " '[A]n appellant challenging an EIR for insufficient evidence must lay out the evidence favorable to the other side and show why it is lacking. Failure to do so is fatal.' " (*Tracy First v. City of Tracy* (2009) 177 Cal.App.4th 912, 934.)

A court's task is not to weigh conflicting evidence and determine who has the better argument. These questions are left to the discretion of the agency and its environmental consultants; it is they who decide how best to prepare an EIR to achieve CEQA's informational purpose. The Board's determinations regarding disputed questions of fact are entitled to the same deference appellate courts give to the factual findings of trial courts. (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 573; *Environmental Council of Sacramento v. City of Sacramento* (2006) 142 Cal.App.4th 1018, 1042.)

### B. Failure to Proceed in a Manner Required by Law

An abuse of discretion may also be established if the agency fails to proceed in a manner required by CEQA. When an agency fails to include information mandated by CEQA in the environmental analysis, the agency fails to proceed in a manner required by law. (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova*

7

(2007) 40 Cal.4th 412, 435 (*Vineyard*); *Sierra Club v. State Bd. of Forestry* (1994) 7 Cal.4th 1215, 1236.) However, where the agency includes the relevant information, but the adequacy of the information is disputed, the question is one of substantial evidence. (*Vineyard*, *supra*, at p. 435; *Laurel Heights*, *supra*, 47 Cal.3d at p. 393.)

When determining whether an agency proceeded in a manner required by law, we do not impose procedural or substantive requirements beyond those explicitly stated in CEQA and the Guidelines. (See § 21083.1; *South Orange County Wastewater Auth. v. City of Dana Point* (2011) 196 Cal.App.4th 1604, 1617.) Such a review requires the court to consider the record as a whole. Accordingly, if some facts show a failure to comply, but the record as a whole supports a finding of compliance, courts should find compliance based on the evidence in the whole record. (See *Ebbetts Pass Forest Watch v. California Dept. of Forestry & Fire Protection* (2008) 43 Cal.4th 936, 945, 949-950.)

The same presumptions apply to review under this standard as under the substantial evidence standard. That is, the EIR is presumed to be legally adequate, and the party challenging the legal adequacy bears the burden of establishing otherwise. (*State Water Resources Control Bd. Cases*, *supra*, 136 Cal.App.4th at p. 723.)

C. Prejudicial Abuse of Discretion

A reviewing court looks not for perfection but for good faith and substantial compliance. (*Western Placer Citizens for an Agricultural & Rural Environment v. County of Placer* (2006) 144 Cal.App.4th 890, 899 [" 'CEQA requires an EIR to reflect a good faith effort at full disclosure; it does not mandate perfection, nor does it require an analysis to be exhaustive' " quoting *Kings County Farm Bureau v. City of Hanford* (1990)

8

221 Cal.App.3d 692, 712].) An error in procedure by itself is not the basis for an adverse judicial determination. There must be a prejudicial abuse of discretion. "[T]here is no presumption that error is prejudicial." (§ 21005, subd. (b).)

The Board's decision to approve the Project despite its significant environmental impact is a discretionary policy decision, entrusted to it by CEQA, which will be upheld as long as it is based on findings of overriding considerations that are supported by substantial evidence. (*Cherry Valley Pass Acres & Neighbors v. City of Beaumont* (2010) 190 Cal.App.4th 316, 357 (*Cherry Valley*); see *City of Long Beach v. Los Angeles Unified School Dist.* (2009) 176 Cal.App.4th 889, 897 (*City of Long Beach* ); §§ 21002, 21083.)

## II

### *ANALYSIS*

Appellants challenge the judgment on three primary grounds. First, they contend the FEIR's analysis of the Project's impacts was deficient. Second, Appellants maintain the Board did not consider a reasonable range of alternatives by dismissing as infeasible the alternatives of distributed generation policy and increased setbacks. Finally, Appellants insist the Board failed to provide an adequate statement of overriding considerations supported by substantial evidence. As we explain below, we determine none of Appellants' contentions are well taken.

9

A.  The FEIR's Consideration of Public Safety, Water Supply,
and the Consequences to Bats

1.  *Turbine Blade Throw and Turbine Collapse*

Appellants challenge the FEIR, arguing it did not sufficiently address certain significant impacts of the Project.  Specifically, they assert the FEIR did not address "significant public safety impacts" caused by turbine blade throw and turbine collapse.  The Board counters that the public safety impacts Appellants raise are not environmental impacts under CEQA.  It also points out that the FEIR addressed potential environmental hazards that could result from the Project.

Appellants claim the FEIR does not adequately discuss the safety hazards presented by the possibility of blade throw (the malfunction of a wind turbine separating from the structure and landing away from the tower) and turbine collapse.  Accordingly, Appellants maintain that the FEIR is inadequate and the judgment must be reversed.  We disagree.

"CEQA requires that an EIR include detailed information concerning, among other things, the significant environmental effects of the project under consideration.  (Pub. Resources Code, §§ 21100, 21100.1)"  (*Rialto Citizens for Responsible Growth v. City of Rialto* (2012) 208 Cal.App.4th 899, 923-924 (*Rialto*).)  " 'Significant effect on the environment' " means a substantial, or potentially substantial, adverse change in the environment.  (§ 21068; see Guidelines, § 15382 [" 'Significant effect on the environment'  means a substantial, or potentially substantial, adverse change in any of the physical conditions within the area affected by the project including land, air, water,

10

minerals, flora, fauna, ambient noise, and objects of historic or aesthetic significance."].)

Here, Appellants have provided no authority or argument explaining how blade throw and turbine collapse adversely impacts the environment. Instead, Appellants all but concede blade throw and tower collapse are safety hazards.[7] We agree with the Board that the potential for personal injury caused by an operation accident is a safety concern, but it is not an environmental impact that must be studied in an EIR. (Cf. *Eureka Citizens for Responsible Government v. City of Eureka* (2007) 147 Cal.App.4th 357, 375-377.) For this reason, Appellants' argument fails.

In addition, the FEIR contains a report entitled "Permitting Setback Requirements for Wind Turbines in California" prepared for the California Energy Commission by California Wind Energy Collaborative. The report states, "The available documentation shows rotor failure probability in the 1-in-1000 per turbine per year range." Accordingly, it appears blade throw is exceedingly infrequent. Further, the report reviews a variety of wind turbine projects and notes "[t]here is no evidence that setbacks were based on formal analysis of the rotor fragment [blade throw] hazard." Put differently, in deciding

---

7       The FEIR discusses the potential for wildfires resulting from "turbine malfunction or mechanical failure" and acknowledges that "flaming debris from a turbine fire can ignite vegetation in the surrounding area." The FEIR explains that most modern turbines are equipped with automatic fire detection systems and reiterates that all future large turbine projects will be subject to discretionary review through the major use permit process. Further, the FEIR acknowledges "there is ultimately no guarantee on a project-specific level that mitigation measures would reduce impacts to a level below significant relative to wildfires; therefore, the proposed project may result in significant impacts related to wildland fires." Appellants do not challenge the FEIR's discussion of the possible environmental impact of wildfires, but argue that the FEIR did not sufficiently address the safety hazard of blade throw and tower collapse.

11

the length of the setback needed, there is nothing in the report indicating that any governmental entity used blade throw as a criteria in establishing the appropriate setback. And although the report states that planning agencies should use "new rotor fragment hazard information" to modify or establish wind turbine setbacks, there is no agreed upon formula or rule. Therefore, there is nothing in the report that supports an argument that a certain length of setback is required to account for blade throw. As such, we are not persuaded that the Board did not appropriately consider blade throw when it certified the FEIR and approved the Project.

Moreover, we are not swayed by Appellants' claim that the Board failed to adequately respond to public comments regarding safety concerns involving blade throw and turbine collapse. Some of the "comments" on which Appellants rely are merely portions of the report "Permitting Setback Requirements for Wind Turbines in California" as well as a Dutch study entitled "Analysis of Risk-Involved Incidents of Wind Turbines." Appellants point to nothing in either of these reports that require a specific setback to account for blade throw or tower collapse.

The other comments cited by Appellants were adequately responded to. In one comment, Appellants claimed that large wind turbines could diminish property values and within that context, asserted that setbacks should be determined for each large wind structure to account for sound levels, shadow flickering, ice shedding, structure failure, and blade breakage and throw off. In response, the Board emphasized that the comments raised concerned social and economic effects that need not be consider in an EIR. (See Guidelines, §§ 15064(e), 15131.) It also reminded Appellants that the Project establishes

12

provisions for permitting large wind turbines in the future under the major use permit process, which will provide further opportunity to provide comments and testimony related to environmental or economic impacts. Such a general response is authorized by CEQA. (See *City of Long Beach*, *supra*, 176 Cal.App.4th at p. 901; *City of Maywood v. Los Angeles Unified School Dist.* (2012) 208 Cal.App.4th 362, 401.) Further, the comment concerned large wind turbines, and the Project, in regard to large turbines, was merely a regulatory amendment. Therefore, a site specific impact for a future large wind turbine is appropriately analyzed during the review process for the particular project. (See *Al Larson Boat Shop, Inc. v. Board of Harbor Commissioners* (1993) 18 Cal.App.4th 729, 747 (*Al Larson*); Guidelines, § 15146.) For this reason as well, the Board's response was sufficient.

Finally, the last comment cited by Appellants did not concern blade throw or tower collapse specifically, but maintenance and safety concerns of wind turbines in general. The Board correctly noted that the maintenance-related comments did not raise an environmental issue and that the safety of small and large wind turbines would be governed by the applicable building code and safety standards for similar structures in the County. We see nothing inadequate regarding the Board's response.

In summary, we determine that the FEIR was not defective and the Board's approval of the Project not improper because the FEIR did not consider in greater detail the safety concerns of tower collapse and blade throw.

## 2. *Water Concerns*

Appellants next claim that the FEIR did not adequately analyze the Project's impact on water supplies.  Specifically, they assert the FEIR did not properly consider the impact on the ground water supply caused by both small and large turbines.  In addition, Appellants maintain the FEIR ignores the Project's impact on the imported water supply as well as cumulative water supply.  We determine none of Appellants' contentions have merit.

### a.  Ground Water

The FEIR makes the following findings relative to small wind turbines' impact on ground water supply:

> "The proposed project would allow small wind turbines or MET facilities without discretionary review.  However, these facilities are not expected to use groundwater for purposes of irrigation, domestic, or commercial demands.  In addition, future small wind turbines would not involve operations that would interfere substantially with groundwater recharge, including but not limited to regional water diversion of water to another groundwater basin, or diversion or channelization of a stream course or waterway with impervious layers, such as concrete lining or culverts for substantial distances (e.g., .25 mile).  Some projects may use small amounts of ground water for cleaning the equipment, such as wind turbine rotor blades, on the site.  The purpose of blade cleaning is to eliminate dust and insect buildup, which otherwise deforms the shape of the airfoil and degrades performance.  As illustrated in Table 3.1.2-3, the American Wind Energy Association estimates water consumption for a wind turbine is approximately 0.001 gallons/kilowatt-hour (kWh).  These small amounts of water usage project would not substantially deplete groundwater supplies or interfere substantially with groundwater recharge such that there would be a net deficit in aquifer volume or a lowering of the local groundwater table level.  Therefore, impacts to groundwater resources would **be less than significant**."  (Fn. omitted, bold in original.)

Here, Appellants claim that the FEIR "erroneously assumes . . . the amount of water required to maintain small turbines." They then attempt to explain their position by pointing to the configuration of small turbines, the wind speed of small turbines, and the conclusion that small turbines produce less power than large turbines. Based on these arguments, Appellants maintain that the FEIR is incorrect and that the water required to maintain small turbines will be greater than what is needed for large turbines.

In essence, Appellants attack the data in the FEIR and ask us to reweigh it. This we cannot do. "A court's task is not to weigh conflicting evidence and determine who has the better argument. These questions are left to the discretion of the agency and its environmental consultants; it is they who decide how best to prepare an EIR to achieve CEQA's informational purpose. The [Board's] determinations regarding disputed questions of fact are entitled to the same deference appellate courts give to the factual findings of trial courts." (*San Diego Citizenry Group v. County of San Diego* (2013) 219 Cal.App.4th 1, 12 (*San Diego Citizenry Group*); see *Laurel Heights*, *supra*, 47 Cal.3d at p. 393 ["A court's task is not to weigh conflicting evidence and determine who has the better argument. . . . We have neither the resources nor scientific expertise to engage in such analysis, even if the statutorily prescribed standard of review permitted us to do so."].) Here, there is no indication that the data on which the FEIR relies to analyze the impact of small turbines on ground water supply was flawed, improper, or otherwise unreliable. Appellants merely conclude that it is unsound and claim the FEIR could not rely on it. This is not a proper challenge in this court under CEQA. (See *San Diego Citizenry Group*, *supra*, at p. 12; *Laurel Heights*, *supra*, at p. 393.)

15

Similarly, we are not persuaded by Appellants' contention that the FEIR's consideration of large turbines' impact on ground water supply was inadequate under CEQA. It is important to note that the Project did not approve of any specific number or placement of large wind turbines. Instead, the FEIR made clear that future proposed large turbine projects must obtain a discretionary major use permit and comply with the County Groundwater Ordinance, the Watershed Protection Ordinance, and General Plan Policy LU-13.2. It also explains that compliance with the Groundwater Ordinance and the General Plan Policy LU-13.2 requires demonstration of a viable water supply. It further explains how the County's Groundwater Ordinance protects the water supply from depletion. The FEIR identifies the likely sources of groundwater for future projects: "The western portion of the County is mostly supplied with imported water from member agencies and the San Diego County Water Authority. The remaining portion of the County is completely dependent on groundwater resources. The County contains three types of groundwater aquifers: fractured rock, alluvial/sedimentary, and Desert basin aquifers." This analysis sufficiently addresses the impacts to groundwater supplies and appropriately defers site-specific analysis to future EIRs. (See *San Diego Citizenry*, *supra*, 219 Cal.App.4th at pp. 22-23.)

Citing *Vineyard*, *supra*, 40 Cal.4th 412, and *Stanislaus Natural Heritage Project v. County of Stanislaus* (1996) 48 Cal.App.4th 182 (*Stanislaus*), Appellants argue the FEIR does not do enough. Their reliance on these two cases is misplaced as neither case involved a regulatory amendment as the one at issue here.

16

The general plan and zoning ordinance amendments in *Vineyard* were part of a project for a 6,000 acre master planned community that included 22,000 residential units, schools, parks, office, and commercial uses, occupying about 480 acres of land. (*Vineyard*, *supra*, 40 Cal.4th at p. 422.) Similarly, *Stanislaus* involved a rezone and plan amendment as part of the approval of a large residential community and resort to be developed in the project area over 25 years. (*Stanislaus*, *supra*, 48 Cal.App.4th at p. 188.) In both *Vineyard* and *Stanislaus*, the specific project details were known, as were the project locations, which were necessary to identify the sources of water and analyze their adequacy. (See *Vineyard*, *supra*, at pp. 421-422; *Stanislaus*, *supra*, at p. 195.)

The court in *Stanislaus* observed that deferral of environmental review was not appropriate under the circumstances of that case because the county there "did not . . . simply adopt or amend a general plan so as to permit the building of homes and other facilities. Instead, the county adopted a specific plan calling for the construction of those facilities and of other particularly described facets of the plan." (*Stanislaus*, *supra*, 48 Cal.App.4th at p. 203.) In contrast, the Board here simply amended its zoning ordinance and general plan in regard to large wind turbines. Also, unlike *Vineyard*, *supra*, 40 Cal.4th 412 and *Stanislaus*, the areas of San Diego County where large turbine projects could be located are not limited to a discrete location that could be studied, but are scattered throughout areas of east San Diego County.

17

As the court in *Stanislaus* acknowledged, an FEIR for general plan and zoning amendments need not be as detailed as an EIR for a project allowed under the amendments. (*Stanislaus*, *supra*, 48 Cal.App.4th at p. 203.)

We determine the present case is more analogous to *San Diego Citizenry*, *supra*, 219 Cal.App.4th 1. In that case, a similar challenge was made to the County's water impact analysis in the FEIR for general plan and zoning ordinance amendments regarding wineries. As here, the amendments in *San Diego Citizenry* required a discretionary permit for some projects while others were allowed without a permit. Appellant in that case also relied on *Vineyard*, *supra*, 40 Cal.4th 412 to support its assertion that the County violated CEQA by not preparing detailed projections about size, location, and water supply impacts for as-yet unidentified future winery operations. (*San Diego Citizenry*, *supra*, at pp. 22-23.) In rejecting this assertion, we explained: "*Vineyard* does not require . . . that the FEIR for a zoning amendment predict the 'total effect on water demands' in the Project area to adequately address water impacts. A conceptual EIR, such as one for a general plan amendment . . . to allow proposed development, meets *Vineyard's* requirements by identifying the likely source of water for new development, noting the uncertainties involved, and discussing measures being taken to address the situation in the foreseeable future." (*Id*. at pp. 22-23, citing *Watsonville Pilots Assn. v. City of Watsonville* (2010) 183 Cal.App.4th 1059, 1092.) For the reasons stated above, the FEIR in this case meets these standards.

b. Cumulative Impact on Ground Water Supply

In addition, Appellants claim the FEIR did not sufficiently analyze the Project's cumulative impact on groundwater supplies. However, as discussed above, the FEIR concluded small turbines will not contribute to any cumulative impact because they use an insignificant amount of water. And, in regard to the Project here, large turbines will not contribute to a cumulatively significant impact because they will be subject to further discretionary review, where mitigation will be required, if necessary.

Appellants insist these findings are incorrect because the EIR for a previously approved large turbine project, the Tule Wind project, found significant cumulative groundwater impacts. Appellants, however, do not mention that the impact was then mitigated to a level below significance. Once again, Appellants take issue with the conclusion that the FEIR reaches and asks us to reweigh the data in the record. As discussed above, this we cannot do. (See *San Diego Citizenry Group*, *supra*, 219 Cal.App.4th at p. 12; *Laurel Heights*, *supra*, 47 Cal.3d at p. 393.) Moreover, a detailed review of the record demonstrates that Appellants' concerns are unfounded.

The Tule Wind project is discussed in a staff response (the Bennett report), which specifically addresses a report Appellants submitted on the cumulative impacts of "Large-Scale Energy Projects" (the Ponce report).[8] The Bennett report uses the Tule Wind

---

[8]    The Ponce report, entitled "Cumulative Impacts of Water Resources of Large-Scale Energy Projects in Boulevard and Surrounding Communities, San Diego County, California," by Victor M. Ponce dated April 30, 2013, was submitted to County staff on the eve of the May 8, 2013 hearing. As the Bennett report observes, the Ponce report contains questionable assertions and conclusions. For example, the magnitude of the

19

project to illustrate how future proposed large turbine projects will be processed.  As the Bennett report explains, the Tule Wind project's estimated water use during construction triggered the need for a groundwater investigation to determine sources of available water and resulted in a groundwater monitoring and management plan that limited water usage and created a threshold at which water consumption would be required to cease.  Through these measures, groundwater impacts that the Tule Wind project FEIR originally identified as cumulatively significant were mitigated so that the project did not contribute to a cumulatively significant impact.

The Bennett report concludes that future proposed large turbine projects will similarly use minimal water except during the construction phase, where high water use triggers Groundwater Ordinance protections, including "a groundwater investigation that addresses cumulative impacts to the project's groundwater basin at maximum buildout of the General Plan."  The FEIR's reliance on future environmental impact review is proper under CEQA because, under the Project, any large wind turbine project will be subject to additional discretionary review.  (See *Al Larson*, *supra*, 18 Cal.App.4th at p. 746.)

*Al Larson* involved a challenge to a cumulative impact analysis in a first tier FEIR for an amendment to a port master plan, which the court framed as follows:  "The FEIR states that it 'focuses on a general overview of cumulative impacts.  These cumulative impacts and associated mitigation measures will [be] addressed in further detail as part of

estimated long-term impacts is questionable since large turbine projects typically use high amounts of water only during the construction phase.  The Ponce report also is critical of County practices regarding water sustainability yet the County evaluates water sustainability in accordance with the practices the Ponce report suggests.

the environmental review of specific projects.'  The Larson Parties view this as a concession that the CEQA requirement to discuss cumulative impacts has been ignored."  (*Al Larson*, *supra*, 18 Cal.App.4th at p. 746.)  In rejecting the challenge, the court stated: "An FEIR need only conform with the general rule of reason in analyzing the impact of future projects, and may reasonably leave many specifics to future EIRs.  'CEQA recognizes that environmental studies in connection with amendments to a general plan will be, on balance, general.' "  (*Id.* at pp. 746-747, citing *Schaeffer Land Trust v. San Jose City Council* (1989) 215 Cal.App.3d 612, 625.)

Here, the FEIR likewise meets CEQA's requirements because it conforms to the rule of reason; it describes the review process applicable to large turbine project proposals, explains how cumulative water impacts will be minimized in this process, and leaves project-specific review to future EIRs.

### c.  Imported Water Supply

Appellants also maintain that the FEIR "improperly deferred" discussion of the Project's impacts on imported water supplies.  In making this argument, Appellants focus on a single sentence in the FEIR:  "A significant impact would result if sufficient water supplies are not available to serve the project from existing entitlements and resources, or if new or expanded entitlements are needed."  However, Appellants' contention overlooks the findings regarding water use in the FEIR.

For example, the FEIR notes, "[s]ome wind turbines may use small amounts of water for cleaning the equipment on site, such as rotor blades."  It explains that future wind turbines are not likely to use imported water because most of the "wind resources

21

areas" affected by the Project are located outside the jurisdiction of the San Diego County Water Authority, which distributes imported water. As such, the FEIR determines that water necessary for small turbines will primarily be provided by groundwater supplies. The FEIR further explains the difficulty of estimating the overall quantity of the groundwater being used because so few groundwater wells are metered to quantify production. This said, the FEIR concludes that small turbines would use "small amounts of water" that "would not impact water supplies."

To the extent a wind turbine would require water services from a water district, the FEIR points out that water district approval would be needed and the district must assure that adequate water sources and entitlements are available to serve the requested waster resources. Put differently, the FEIR concludes that most of the water needed for small turbines will be provided by ground water and the impact will be minimal. To the extent that additional water could be needed, the subject water district will determine if sufficient water supply exists. There is no indication in the FEIR that small turbines will impact the water supply in San Diego County. They simply do not require much water to operate beyond using a small amount for cleaning purposes. Moreover, Appellants point to no data in the record indicating that FEIR ignores small wind turbines' impact on the water supply.

The FEIR appropriately notes that any large wind turbines will be subject to discretionary review and be required to obtain a major use permit. As part of the Board's discretionary review process, all future large wind turbine projects will be evaluated under CEQA. Such consideration is proper under CEQA for a regulatory amendment.

22

(See *Stanislaus*, *supra*, 48 Cal.App.4th at p. 203; *San Diego Citizenry*, *supra*, 219 Cal.App.4th at pp. 22-23.)

### 3. *Barotrauma to Bats*

Appellants next assert that the FEIR did not adequately address the Project's potential of causing barotrauma to bats. Barotrauma "[i]involves tissue damage to air-containing structures caused by rapid or excessive pressure change; pulmonary barotrauma is lung damage due to expansion of air in the lungs that is not accommodated by exhalation." Appellants maintain that moving wind turbine blades create abrupt waves of low pressure, which can cause passing bats to suffer grave barotrauma. Alternatively stated, Appellants do not take the position that the FEIR did not sufficiently consider the Project's impact on bats in general, but was inadequate because it did not specifically and sufficiently discuss and analyze barotrauma to bats.

The FEIR clearly addresses bat fatalities caused by wind turbines. It analyzes mortality rates and determines the Project will result in cumulatively significant impacts to avian species, including bats, even with mitigation measures such as setbacks from sensitive habitat areas to minimize contact, designs to reduce nesting, and height limitations. The FEIR, however, does not address barotrauma. Appellants insist this omission is fatal to the FEIR's compliance with CEQA. We disagree.

Because the FEIR is presumed to be legally adequate, Appellants here bear the burden of establishing otherwise. (*State Water Resources Control Bd. Cases*, *supra*, 136 Cal.App.4th at p. 723.) As such, Appellants need to show that the FEIR had to discuss

barotrauma specifically despite the fact the FEIR analyzes the Project's impact on bats' mortality rates in general. They have not done so.

Appellants point to no study or report indicating the actual mortality rate in bats caused by barotrauma occurring near wind turbines. In a letter to the Department of Planning and Land Use dated April 12, 2012, barotrauma is mentioned as a "recently recognized, serious adverse impact of wind turbines on bats." However, there is no source for this statement. In their opening brief, Appellants cite to the Environmental Protection Agency's (EPA) comments on a draft environmental impact statement (EIS) regarding the Campo Shu'Luuk Wind project wherein the EPA recommends that the final EIS discuss any information available regarding differences in pressure change for various turbine sizes that could affect barotrauma and other impacts on bats. In making this recommendation, the EPA noted that the draft EIS failed to specify the expected bat mortality rates and did not provide any basis for its conclusion that the project's impact on bats would be minimal. Thus, the EPA asked for additional discussion regarding bat mortality rates and mitigation. Here, Appellants do not explain how the Campo Shu'Luuk Wind project is similar to the instant Project. While the EPA notes several problems in the draft EIS's discussion of the subject project's impact on bats, Appellants only point to one here, the absence of a discussion of barotrauma. Also, Appellants gloss over the fact that the EPA comments are dated March 4, 2013, some two months after the FEIR was completed. In addition, Appellants do not point to any similar comments made by the EPA, or relevant state agency, about the FEIR here. In short, Appellants have not

24

shown by any citation to the record that it was essential for the FEIR to address barotrauma in bats.

Also, consistent with the Tule Wind project EIR, the Board argues that the FEIR discusses "collision" rates for bats with the understanding that it is a generic term for mortality rates and adequately informs the public and decision makers of the Project's significant adverse impact on bats. Further, the Board observes that the California Department of Fish and Wildlife did not recommend additional discussion in the FEIR of the Project's impact on bats.

We also are not persuaded by Appellants' contention that the Board usurped public review by belatedly examining barotrauma outside the FEIR and unilaterally proclaiming that, had it been discussed, the result would have been the same. To this end, Appellants emphasize that the Board did not address barotrauma until May 13, 2013, two days before final approval of the Project. Appellants are referring to the Board's response to their comment regarding barotrauma made May 7, 2013. Appellants commented that "[t]he risk of barotrauma to bats is a recently recognized, serious adverse impact of wind turbines on bats. The FEIR must analyze this issue." In response, a biologist on behalf of the Board noted that Appellants failed to cite studies providing the risks of barotrauma. We determine that the Board's response to the Appellants' comment did not render the FEIR legally insufficient. The comment, made at the eleventh hour, included no source to support its conclusion that the FEIR must consider barotrauma to bats.

In short, the FEIR analyzed the Project's impacts on bats. Appellants have not shown that the FEIR violated CEQA because it did not separately discuss the risk of barotrauma on bats as a result of the Project.

IV

*PROJECT ALTERNATIVES*

Next, Appellants argue that the FEIR did not analyze a reasonable range of project alternatives. Specifically, they claim the range of alternatives considered in the FEIR was "exceptionally narrow." In addition, Appellants take issue with the FEIR failing to consider two proposed alternatives: (1) increased setbacks between inhabited areas and wind turbines and (2) a distributed generation policy alternative involving wind and solar power installations on existing structures in urban areas. We find no merit in Appellants' contentions.

As with our review of other elements of an EIR, the only role for this court in reviewing an EIR's discussion of alternatives is to ensure that the public and responsible officials are adequately informed of the environmental consequences of their decisions before they are made. (*Berkeley Keep Jets Over the Bay Com. v. Board of Port Commissioners* (2001) 91 Cal.App.4th 1344, 1356.)

CEQA requires an EIR to identify and discuss a reasonable range of alternatives to a proposed project, or its location, that would feasibly attain most of the project's basic objectives while reducing or avoiding any of its significant effects. (§ 21002.) The EIR must evaluate the comparative merits of those alternatives. (Guidelines, § 15126.6, subd. (a).) The requirement stems from the policy that public agencies should require the

26

implementation of feasible alternatives or feasible mitigation measures to reduce a project's significant environmental impacts. (§ 21002.) Our Supreme Court has described the discussion of mitigation and alternatives as "the core of an EIR." (*Citizens of Goleta Valley v. Board of Supervisors*, *supra*, 52 Cal.3d at p. 564.)

An EIR need not discuss every conceivable alternative to a project. (Guidelines, § 15126.6, subd. (a).) The nature and scope of the alternatives to be studied in an EIR is governed by the rule of reason. (*In re Bay-Delta Progammatic EIR Coordinated Proceedings* (2008) 43 Cal.4th 1143, 1163 (*In re Bay-Delta*); *City of Long Beach*, *supra*, 176 Cal.App.4th at p. 920.) Under the rule of reason, an EIR needs to discuss only those alternatives necessary to permit a reasoned choice. (Guidelines, § 15126.6, subd. (f); *Residents Ad Hoc Stadium Comm. v. Board of Trustees* (1979) 89 Cal.App.3d 274, 283.)

The range of alternatives examined in an EIR should be designed to foster informed decisionmaking and public participation. (Guidelines, § 15126.6, subds. (a)-(f); see *Mann v. Community Redev. Agency* (1991) 233 Cal.App.3d 1143, 1151 [EIR should provide "enough of a variation to allow informed decisionmaking."].) When an EIR discusses a reasonable range of alternatives sufficient to foster informed decisionmaking, it is not required to discuss additional alternatives substantially similar to those discussed. (*Preservation Action Council v. City of San Jose* (2006) 141 Cal.App.4th 1336, 1358-1359; *Mira Mar Mobile Community v. City of Oceanside* (2004) 119 Cal.App.4th 477, 491.) An EIR is not required to include alternatives suggested by members of the public if it discusses a reasonable range of other alternatives. (Guidelines, § 15126.6, subds. (a) & (c); see *Save San Francisco Bay Assn. v. San Francisco Bay Conserv. & Dev. Comm'n.*

27

(1992) 10 Cal.App.4th 908, 919, 922 [city not required to include proposed alternatives because their advantages and disadvantages did not substantially differ from the five prototypical alternatives selected for in-depth discussion].)

Under the applicable standard, an EIR may be found legally inadequate only if the range of alternatives it contains is unreasonable in the absence of the omitted alternatives. (2 Kostka & Zischke, Practice under the Cal. Environmental Quality Act (Cont.Ed.Bar 2015) § 15.17, pp. 15-24.)  As the courts have stated repeatedly, " '[a]bsolute perfection is not required; what is required is the production of information sufficient to permit a reasonable choice of alternatives so far as environmental aspects are concerned.' [Citation.]" (*Village Laguna of Laguna Beach, Inc. v. Board of Supervisors* (1982) 134 Cal.App.3d 1022, 1029.)  The selection of alternatives discussed "will be upheld, unless the challenger demonstrates 'that the alternatives are manifestly unreasonable and that they do not contribute to a reasonable range of alternatives.' [Citation.]" (*California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 988.)

Here, the FEIR analyzes three project alternatives.  The first, the limited small wind turbine alternative, consists of three components:  reduced project area, reduced height of wind turbine towers, and fewer turbines.  This alternative was determined to be the "environmentally superior" alternative.

The second alternative discussed in the FEIR, the limited large wind turbine alternative, involves three substantial changes from the Project.  First, this alternative would reduce the Project area and shift development to more rural and semirural areas as designated by the General Plan.  Second, large wind turbines would be permitted within

wind resource areas classified as "fair" through "superb" and would not be permitted within "marginal" wind resource areas as they are with the Project. Third, this alternative would retain the existing policies and language of the General Plan. In other words, this option would not involve any amendment to the General Plan.

The last alternative considered in the FEIR is the no project (no zoning ordinance amendment) alternative. This alternative did not meet any of the Project objectives.

In cursory fashion, Appellants maintain the range of alternatives considered in the FEIR was too narrow. They, however, do not take issue with the substantive discussion of the alternatives, but instead, imply that other alternatives should have been included, especially such alternatives that would reduce the Project's significant environmental impacts to a less than significant level. In making this argument, Appellants ignore the Project's focus on renewable wind energy and claim the Project's goal is "generating renewable energy" in general (regardless of the source). However, Appellants do not cite to any authority that supports its position that the FEIR's goal is too narrow or otherwise allows a challenger to change the Project's goal.

For example, Appellants claim the instant matter is analogous to *Habitat and Watershed Caretakers v. City of Santa Cruz* (2013) 213 Cal.App.4th 1277 (*HAWC*) and *Center for Biological Diversity v. County of San Bernardino* (2010) 185 Cal.App.4th 866

29

(*Center for Biological Diversity*), and as such, the considered alternatives were insufficient. Appellants' reliance on these two cases is misplaced.[9]

In *HAWC*, *supra*, 213 Cal.App.4th 1277, the subject project involved an amendment to the City of Santa Cruz's sphere of influence to include a portion of the University of California, Santa Cruz (UCSC) that would allow Santa Cruz to provide water and sewer services to a new development at UCSC. (*Id*. at p. 1283.) The court determined that the EIR was legally inadequate because it did not discuss *any* feasible alternative, such as a limited water alternative, that could avoid or lessen the significant environmental impact of the subject project on Santa Cruz's water supply. (*Id*. at p. 1305.)

In contrast, here, in addition to the no project alternative, the FEIR specifically addresses an alternative that could lessen the environmental impact of the Project. The limited small wind turbine alternative would not block viewsheds that would be obstructed by small turbines allowed by the Project, would result in less than significant impacts to riparian habitat and other sensitive natural communities, would reduce the risk of raptor collision, and would result in less than significant impact to human remains and paleontological resources. Therefore, there is no analogous situation in the instant matter like the one in *HAWC*, *supra*, 213 Cal.App.4th 1277, where the EIR did not consider any

---

9    In *Center for Biological Diversity*, *supra*, 185 Cal.App.4th 866, the issue before the court was not the adequacy of the considered alternatives, but the lack of substantial evidence supporting the rejection of the infeasibility of an alternative. (*Id*. at pp. 883-884.) Accordingly, that case does not support Appellants' position that the FEIR's considered alternatives were too narrow.

30

alternative that would avoid or lessen the significant environmental impact of the subject project. We thus are satisfied that the FEIR presented the public and the Board with information sufficient to permit a reasonable choice of alternatives and Appellants have not demonstrated that the alternatives were manifestly unreasonable. (See *Village Laguna of Laguna Beach, Inc. v. Board of Supervisors*, *supra*, 134 Cal.App.3d at p. 1029; *California Native Plant Society v. City of Santa Cruz*, *supra*, 177 Cal.App.4th at p. 988.)

Further, contrary to Appellants' assertion, we conclude that the Project is not too narrow. "CEQA does not restrict an agency's discretion to identify and pursue a particular project designed to meet a particular set of objectives." (*California Oak Foundation v. Regents of University of California* (2010) 188 Cal.App.4th 227, 276-277.)

"Although a lead agency may not give a project's purpose an artificially narrow definition, a lead agency may structure its EIR alternative analysis around a reasonable definition of underlying purpose and need not study alternatives that cannot achieve that basic goal." (*In re Bay-Delta*, *supra*, 43 Cal.4th at p. 1166.) "For example, if the purpose of the project is to build an oceanfront resort hotel [citation] or a waterfront aquarium [citation], a lead agency need not consider inland locations." (*Ibid.*) Likewise, a lead agency need not consider lower density housing that would defeat the underlying purpose of providing affordable housing. (*Sequoyah Hills Homeowners Assn. v. City of Oakland* (1993) 23 Cal.App.4th 704, 715.)

Here, the underlying purpose of the Project is encouraging wind energy. With this in mind, we consider Appellants' additional arguments that the FEIR improperly discarded two alternatives as infeasible without more analysis.

31

"The entire purpose of the alternatives section in an EIR is to consider environmentally superior alternatives that would 'accomplish most of the project objectives.' " (*The Flanders Foundation v. City of Carmel-by-the-Sea* (2012) 202 Cal.App.4th 603, 623.) "[A] lead agency may reject an alternative as infeasible because it cannot meet project objectives, as long as the finding is supported by substantial evidence in the record." (*Rialto*, *supra*, 208 Cal.App.4th at p. 949.) CEQA defines " '[f]easible' " as "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors." (§ 21061.1.) In determining whether changes to a project are feasible, a public agency shall consider economic, social, technological, environmental, and other factors. (§ 15131, subd. (c).)

Absent legal error, the Board's infeasibility findings are entitled to great deference and are presumed correct. (*California Native Plant Society v. City of Santa Cruz*, *supra*, 177 Cal.App.4th at p. 997.) "The parties seeking mandamus bear the burden of proving otherwise, and the reviewing court must resolve reasonable doubts in favor of the administrative findings and determination." (*Sierra Club v. County of Napa* (2004) 121 Cal.App.4th 1490, 1497.)

Here, Appellants challenge two alternatives that were rejected in the FEIR: (1) increased setbacks, and (2) distributed generation policy. The FEIR notes that some commentors suggested that large scale wind turbines should have set backs of " 'at least 1.5 to 2 miles from occupied buildings, recreation areas, public roads, protected habitat and wildlife, and more.' " The FEIR determines that this alternative would not achieve

32

three Project objectives: (a) "[f]acilitate the use of renewable wind energy within the County pursuant to existing and future statewide goals," (b) "[s]treamline and clarify the approval process for the development and operation of small wind turbines," and (c) "[u]pdate regulations for large wind turbines to be consistent with current wind turbine technology and designs." Thus, the FEIR concludes that this alternative would not "feasibly accomplish the basic objectives of the [P]roject."

Appellants insist that the increased setback warranted further consideration because it satisfied five of the Project's goals. In addition, they argue that there is no support for the conclusion that it is incompatible with the Project's fundamental goals. We disagree.

The Project includes setbacks of at least 1.1 times the height of the large wind turbine, subject to other concerns that may be raised in the major use permit process. The increased setbacks alternative increases the length of the setback exponentially over that of the Project mandated setback. No doubt such a restriction would greatly reduce the number of wind turbines and substantially decrease the area on which wind turbines may be placed. Therefore, it logically follows that such an alternative would not be feasible because it does not achieve the Project's underlying purpose of encouraging wind energy. (See *In re Bay-Delta*, *supra*, 43 Cal.4th at p. 1165.) Indeed, the increased set back alternative would have made the Project's purpose very difficult to achieve as it would significantly reduce where a large wind turbine could be placed.

The distributed generation policy alternative would have required the Board to develop a policy that ranks renewable energy projects in a manner that gives preferences

33

to, or otherwise incentivizes, distributed generation projects in urbanized areas. For example, Appellants state that this alternative would have encouraged small wind and solar electricity facilities atop existing structures in urban areas. The FEIR determines that the distributed generation policy is infeasible for two reasons. First, it asserts that the Board regulates land uses and development within its jurisdiction, but does not regulate energy distribution on a global level. Instead, the FEIR notes that the Californian Public Utility Commission would be the appropriate authority to implement a distributed generation policy. Second, the FEIR observes the County has limited wind resources areas, which lie predominately outside of urbanized areas. Therefore, incentivizing distributed generation in urbanized areas would discourage wind projects away from the areas of the County with the greatest wind resource potential. As such, the FEIR ultimately concludes that the distributed generation policy alternative is outside the scope of the Project and is "not conducive to achieving the [P]roject objectives."

Appellants take issue with the FEIR's failure to further consider the distributed generation policy alternative. They assert FEIR's first reason for rejecting this alternative is false and that the Board has the authority to finance programs to incentivize local distributed generation renewable energy sources. However, we need not resolve this dispute because we are satisfied that the FEIR's second reason for rejecting the distributed generation policy is sound.

Again, Appellants' argument is based on the faulty premise that the Project's purpose is too narrow. It is not. The Project amends current zoning requirements involving wind turbines. Nevertheless, Appellants claim that the only purpose of a wind

34

turbine is to generate renewable energy. Therefore, they conclude the Project's true purpose is to generate renewable energy regardless of the source. According to Appellants, the FEIR should have considered all means of generating renewable energy that would have less of an environmental impact than the Project. Appellants' argument overlooks that the Project is focused on addressing zoning for wind turbines specifically, not merely encouraging the production of renewable energy in general. Although there may be other sources of renewable energy, Appellants have not pointed to any authority that would require the FEIR to consider all sources of renewable energy in connection to a Project focusing on encouraging the production of wind energy through zoning amendments. There is nothing in CEQA that prohibits such a scope of a proposed project. (See *California Oak Foundation v. Regents of University of California*, *supra*, 188 Cal.App.4th at pp. 276-277.) The FEIR properly rejected the distributed generation policy alternative.

V

*STATEMENT OF OVERRIDING CONSIDERATIONS*

"An agency must adopt a statement of overriding considerations when it approves a project in spite of significant, unavoidable environmental impacts that cannot be sufficiently reintegrated. (§ 21081, subd. (b); Guidelines, § 15093.)" (*Woodward Park Homeowners Assn., Inc. v. City of Fresno* (2007) 150 Cal.App.4th 683, 717 (*Woodward Park*).) The statement reflects the "final stage" in the agency's decisionmaking process. (*Sierra Club v. Contra Costa County* (1992) 10 Cal.App.4th 1212, 1222; § 21081.) At

35

least one overriding consideration must be stated for each of the project's significant and unavoidable environmental impacts. (§ 21081, subd. (b).)

"Overriding considerations contrast with mitigation and feasibility findings. They are 'larger, more general reasons for approving the project, such as the need to create new jobs, provide housing, generate taxes, and the like.' [Citation.]" (*Woodward Park*, *supra*, 150 Cal.App.4th at p. 717.) By contrast, mitigation and feasibility findings " 'typically focus on the feasibility of specific proposed alternatives and mitigation measures.' " (*Sierra Club v. Contra Costa County*, *supra*, 10 Cal.App.4th at p. 1222.) Overriding considerations are intended to show the "balance" the agency struck in weighing the " 'benefits of a proposed project against its unavoidable environmental risks.' " (*Ibid*.)

In its statement of overriding considerations, the Board provides four categories of benefits for approving the Project despite its significant environmental impacts that could not be mitigated. These categories are energy and greenhouse gas reduction benefits, technological benefits, economic benefits, and regulatory benefits. Under each category, the Board more thoroughly explains the expected benefits.

For example, the Board points out that the Project will help reduce potential energy shortages and outages by allowing the development of small and large wind turbines that will help provide a local energy supply. The Board also emphasizes that the Project will further the goals of the California Renewable Portfolio Standard and other similar renewable projects in the state.

36

The Board also discusses the technological benefits of the Project. The Project brings the zoning regulations in line with current wind turbine technologies and provides expanded opportunities for wind turbine development.

In regard to economic benefits, the Board concedes the Project is not expected to generate a significant number of new permanent jobs, but would result in some new job opportunities, such as temporary construction jobs. The Board further observes the Project will provide residents with relief from high energy costs and reduce demand on utility systems. In addition, the Board notes large wind turbine projects developed under the Project could benefit economies of rural communities by providing a steady income through lease or royalty payments to farmers and other landowners.

The Board also discusses several regulatory benefits. The Project streamlines and clarifies the approval process for the development and operation of small wind turbines. The Project's criteria for small turbines will help reduce potential environmental impacts from small turbines. And the Project will expand opportunities for large wind turbines by updating currently outdated zoning regulations to accommodate current wind turbine technology.

Like mitigation and feasibility findings, however, overriding considerations must be supported by substantial evidence in the EIR or elsewhere in the administrative record. (*Sierra Club v. Contra Costa County*, *supra*, 10 Cal.App.4th at p. 1223; Guidelines, § 15093, subd. (b).) A lead agency's decision to approve a project despite its significant environmental impacts is a discretionary policy decision, entrusted to it by CEQA, and will be upheld as long as it is based on findings of overriding considerations that are

supported by substantial evidence. (*Towards Responsibility in Planning v. City Council* (1988) 200 Cal.App.3d 671, 685; *Sierra Club v. Contra Costa County*, *supra*, at p. 1224; §§ 21002, 21083.)

Appellants challenge the statement of overriding considerations on two grounds. First, they argue that the FEIR's insufficient analysis of Project alternatives renders the statement invalid. As we discuss above, the FEIR sufficiently addresses Project alternatives and explains why some alternatives were infeasible. Therefore, we find no merit to Appellants' first argument.

Second, Appellants claim sufficient evidence does not support the statement of overriding considerations. We disagree.

Ostensibly, Appellants challenge the evidence supporting the Board's finding that the Project produces economic benefits. However, a closer examination of Appellants' contentions reveals that they actually take issue with the Board's conclusion that the economic benefits outweigh the Project's significant environmental impacts. For example, Appellants emphasize that the Project will result in temporary jobs. This is precisely what the Board concedes in the statement of overriding considerations: "While the Project is not expected to generate a significant number of new permanent jobs, some new job opportunities would result, such as temporary construction jobs." And although Appellants contest some of the evidence the superior court cited in denying their petition for a writ of mandate, Appellants fail to " 'lay out the evidence favorable to the [Board] and show why it is lacking.' " (*San Diego Citizenry*, *supra*, 219 Cal.App.4th at p. 12.) This approach is fatal to their claim. (*Id*. at p. 17.) Moreover, Appellants simply ignore

38

the other evidence in the record (letters from green power companies and testimony at San Diego Planning Commission and Board meetings) that supports the Board's conclusion that the Project would result in temporary jobs.

Overlooking this evidence, Appellants maintain: "[N]either the FEIR nor the Statement provides any supporting analyses showing how 'some' temporary construction jobs would confer an economic benefit sufficient to *outweigh* the Project's 24 *significant* environmental impacts." (Italics in original.) Therefore, Appellants are not challenging the evidence supporting the Board's determination that the Project would create temporary jobs, but instead, dispute the Board's decision to approve the Project despite its environmental impacts. However, as permitted under CEQA, the Board determined that the benefits arising out of the Project outweighed the Project's adverse environmental impacts. (See *California Native Plant Society v. City of Santa Cruz*, *supra*, 177 Cal.App.4th 957, 983, quoting *City of Marina v. Board of Trustees of California State University* (2006) 39 Cal.4th 341, 368 [The override decision "lies at the core of the lead agency's discretionary responsibility under CEQA and is, for that reason, not lightly to be overturned."].) Here, Appellants have not provided any reason that the Board's finding that the Project would create temporary jobs is not supported by substantial evidence or any other valid reason for challenging the Board's finding that the Project provides an economic benefit in the form of temporary jobs. They simply ask this court to reconsider the Board's balancing of Project benefit and impacts. This we cannot do. "It is not this court's place to second-guess this discretionary policy determination, but to uphold it if

39

substantial evidence supports its underlying findings." (*Cherry Valley*, *supra*, 190 Cal.App.4th at p. 359.)

Appellants' attack on the second economic benefit fares no better. Instead of arguing that there is insufficient evidence that small turbines would provide residents with relief from high energy costs, Appellants claim that "the FEIR provides no analysis demonstrating that small turbines would in fact produce energy at less cost than roof-top solar and other forms of distributed energy." Appellants do not take issue with the evidence supporting this benefit, but instead, insist that the Board had to compare the Project's economic benefits with the economic benefits of the distributed generations policy alternative. To this end, they rely on *Uphold Our Heritage v. Town of Woodside* (2007) 147 Cal.App.4th 587 (*Uphold Our Heritage*). Appellants' reliance on that case is misplaced.

Contrary to Appellants' contention, *Uphold Our Heritage*, *supra*, 147 Cal.App.4th 587, does not stand for the proposition that a Board cannot justify a Project based on benefits that a rejected alternative would have provided. That case addressed whether substantial evidence supported the finding that all the alternatives analyzed in the EIR were "economically infeasible" when there were no costs in the record regarding the subject project. Here, the FEIR determined that the distributed generations policy alternative was infeasible because it did not achieve the Project's objective of encouraging wind energy. The Project involves zoning amendments regarding small and large wind turbines. It was not concerned with renewable energy in general. Thus, the alternative to incentivize renewable energy in general, in urban areas, was beyond the

40

focus of the Project. The FEIR properly rejected it and nothing in *Uphold Our Heritage* leads us to question the substantial evidence supporting the Board's stated economic benefit that small turbines would provide residents with relief from high energy costs.

In addition, Appellants claim the Board's stated third economic benefit[10] is not supported by substantial evidence. They assert that the trial court improperly "rested its decision on one insubstantial statement that some payments are, at undisclosed times and in undisclosed quantities made to land owners." Appellants have not satisfied their burden to put forth all evidence favorable to the decision and explain why it is insufficient. (See *San Diego Citizenry*, *supra*, 219 Cal.App.4th at p. 12.) Here, the FEIR includes the statement that, "[l]arge wind turbine projects can benefit economies of rural communities by providing a steady income through lease or royalty payments to farmers and other landowners." The FEIR bases this statement on a document entitled "Wind Energy and the Environment" that was accessed October 17, 2010, on the American Wind Energy Association Web site. Appellants have not cited to the record where they challenged the validity of this article or otherwise offered contrary evidence for the Board's consideration. Appellants have not sufficiently explained why the FEIR cannot rely on this article. In short, they have not shown that substantial evidence does not support the Board's finding that the Project will produce the third economic benefit.

---

10    The third economic benefit discussed by the Board is that large wind turbine projects developed under the Project could benefit economies of rural communities by providing a steady income through lease or royalty payments to farmers and other landowners.

Appellants' challenge of the technological and regulatory benefits found by the Board is similarly flawed. Again, Appellants fail to provide the evidence in the record and explain why it is insufficient. Instead, they claim the benefits are not actually benefits and do not outweigh the Project's significant environmental impacts. This is not a proper challenge of the statement of overriding considerations. Appellants' failure to discuss the evidence in the record purporting to support the Board's determination of Project benefits is fatal to their challenge. (*San Diego Citizenry Group*, *supra*, 219 Cal.App.4th at p. 17.)

Further, we are satisfied that the technological and regulatory benefits are supported by substantial evidence.

In summary, the statement of overriding considerations is supported by substantial evidence. Appellants do not provide any compelling argument to the contrary. Consequently, the Board's policy decision that the Project benefits outweigh its environmental impacts cannot be overturned. (See *San Diego Citizenry Group*, *supra*, 219 Cal.App.4th at p. 24; *California Native Plant Society v. City of Santa Cruz*, *supra*, 177 Cal.App.4th at p. 983. We will not second guess the Board's exercise of discretion. (See *Cherry Valley*, *supra*, 190 Cal.App.4th at 359.)

DISPOSITION

The judgment is affirmed.


                                                    HUFFMAN, Acting P. J.

WE CONCUR:


McDONALD, J.


AARON, J.