Filed 10/29/15  Norris v. Equity Bancorp CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION 2

| | |
|---|---|
| STEVEN NORRIS,<br><br>　　　Plaintiff and Appellant,<br><br>v.<br><br>EQUITY BANCORP, INC., et al.,<br><br>　　　Defendants and Respondents. | A136185<br><br>(Contra Costa County<br>Super. Ct. No. MSC-10-02505) |

**INTRODUCTION**

An investor attempted to prevent his lender from foreclosing real property the investor had used to secure a $1.8 million loan.  The investor and the lender entered into a forbearance agreement.  Pursuant to this agreement, the investor made a $400,000 "principal paydown" payment on the loan, but ultimately failed to meet the condition that he provide additional security for the loan and fell behind on the monthly payments.  After forbearing for several months, the lender foreclosed.  The investor filed suit against the lender, alleging that the lender violated the "security first" principle in Code of Civil Procedure section 726[1] and that the lender was unjustly enriched by keeping his $400,000 payment.  The trial court granted defendants' motion for summary judgment, finding the security-first principle inapplicable because the $400,000 payment had been made voluntarily in an effort to avoid foreclosure.  We affirm.

---

[1] All further undesignated statutory references are to the Code of Civil Procedure.

1

## FACTS AND PROCEDURAL BACKGROUND

The undisputed evidence established the following. In March 2007, plaintiff Steven Norris entered into a $1.8 million loan agreement with defendant Equity Bancorp, Inc.[2] To secure this loan, Norris provided Equity Bancorp with deeds of trust for two properties—one located in Lafayette, California (Lafayette Property) and the other located in Sparks, Nevada (Sparks Property).[3] Norris sought the $1.8 million loan as part of a joint venture agreement with Ernest Bonner, Derek Wheat and others. Before Norris obtained the loan, Bonner and Wheat represented to Norris that the Lafayette Property was free and clear of any liens. After the loan closed, Bonner failed to make payments to Norris and, at some point, Norris fell behind in his payments on the $1.8 million loan.

The representation that the Lafayette Property was free and clear of any liens turned out to be false. After the loan was closed, a company called Equity Funding Group, L.P. (Equity Funding) contacted Norris and informed him that it held a substantial lien on the Lafayette Property. On April 27, 2007, Equity Funding filed a lawsuit in Contra Costa County Superior Court against Norris, Equity Bancorp, Bonner, and others (Equity Funding Litigation). Equity Funding alleged that it had loaned Bonner $2.4 million secured by a first-priority deed of trust on the Lafayette Property. It alleged that in January 2007, someone had recorded: (1) fraudulent grant deeds purporting to convey the Lafayette Property from Bonner to Norris, and (2) a forged deed of reconveyance that purported to release and reconvey Equity Funding's deed of trust in the Lafayette Property. Equity Funding sought a judgment that it was the holder of a first-priority deed of trust; that the fraudulent grant deeds and reconveyance deed were void; and that Equity Bancorp's deed of trust on the Lafayette Property was void.

---

[2] As we will discuss, the loan agreement was eventually assigned to defendant Stewart Title Guaranty Company (Stewart Title).

[3] Norris owned a partial interest in the Sparks Property, but arranged to have the other owner subrogate his interest to Equity Bancorp.

2

The day after the Equity Funding Litigation was filed, Equity Bancorp filed a notice of default as to the Sparks Property in Nevada, declaring all sums secured by the deed of trust on the Sparks Property due immediately, and threatening foreclosure.

On May 25, 2007, Norris's attorney, Leslie Levy, emailed Equity Bancorp's attorney, Michael Glass, a proposal to stay the foreclosure of the Sparks Property. Norris's proposal provided: (1) Equity Bancorp would continue to have an equitable interest in the Lafayette Property; (2) Equity Bancorp would continue to have its lien on the Sparks Property; (3) Norris would pay $400,000 cash immediately; (4) Norris would pay $200,000 on or before September 2007; (5) Norris would continue to make payments on the principal and interest on the $1.8 million loan; and (6) Equity Bancorp would take a lien on Norris's interest in five 40-acre lots in Nevada. During August and September 2007, Levy and Glass exchanged a series of emails in which Equity Bancorp requested the legal descriptions and addresses of the property Norris was proffering as additional security as well as the names of his co-owners so Equity Bancorp could obtain their consents.

In September 2007, Norris and Equity Bancorp entered into a forbearance agreement. The agreement recited Equity Bancorp's position that Norris's joint venture agreement with Bonner and "the allegations set forth in the pleadings of the [Equity Funding Litigation] collectively and independently constitute a breach of various warranties and representations made by [Norris] and constitutes an alienation" of the Lafayette Property in violation of the $1.8 million loan agreement. In exchange for Equity Bancorp forbearing institution of foreclosure proceedings against the Sparks Property, Norris agreed to (1) pay $400,000 to be applied to the principal of the $1.8 million loan (defined as a "Principal Paydown"); (2) pay $15,000 in legal fees; and (3) provide as additional security for the $1.8 million loan five 40-acre parcels and one 40-acre parcel, all in Nevada. Under the agreement, Norris's obligations under the $1.8 million loan agreement and note would continue.

The forbearance agreement included a provision regarding its effectiveness: "4. Effectiveness This Agreement shall become effective only upon the satisfaction of each

3

of the conditions by Borrower listed below on or before October 1, 2007 (the 'Closing'). In the event that Borrower fails to meet any of the following Conditions on or before the Closing, this Agreement shall have no effect and shall be void and Lender shall be entitled to proceed against Borrower with any and all of Lender's remedies . . . ." Included in the list of conditions that Norris had to satisfy was the $400,000 principal paydown, and the delivery of fully executed copies of the deeds of trusts on the additional security properties.

The forbearance agreement also contained a provision regarding its termination: "[5]b. <u>Termination of Forbearance</u> Upon the occurrence of any default or breach of any of the terms and conditions of this Agreement or any of the Loan Documents . . . or upon any other event, omission, or failure of condition that would constitute a default or breach after notice or lapse of time, or both as set forth in the Loan Documents or this Agreement, the Forbearance shall immediately terminate without notice to Borrower and be of no further force or effect."

On or about October 8, 2007, Norris made the $400,000 principal pay down called for in the forbearance agreement. This payment was credited to the existing balance of the $1.8 million loan. On October 25, Glass sent Levy a "tentative loan statement reflecting the recent paydown," which showed a $400,000 payment applied to principal in early October and a remaining loan balance of $1,463,000.00. Glass noted that the statement continued to list the default interest rate, but this would "be removed per the terms of the forbearance agreement when Mr. Norris delivers the two deeds of trust on the additional properties." He further stated, "I believe Mr. Veiluva [an attorney for Equity Bancorp and Stewart Title[4]] is put[ting] the finishing touches on these documents. Please coordinate with him in getting these documents squared away." Levy did not object to the loan statement.

---

[4] Subsequent to the forbearance agreement, Equity Bancorp assigned its interest in the March 2007 Loan Agreement to defendant Stewart Title.

On December 4, 2007, Levy sent her client Norris an email, with a copy to Glass, stating: "We already sent [Mr. Veiluva] your original signature on the Forbearance Agreement. What they want is your signature (notarized) on the two deeds of trust (mortgages) for the two other Nevada properties that you pledged as security. I thought that Michael Glass' office already prepared those and that they were put to bed a long time ago, but apparently not." Levy asked Norris if the deeds of trust had been prepared and "If so, do you have them? If so, Placer/Stewart needs them signed now."

On February 25, 2008, Veiluva sent Levy a letter entitled "Default Under Forbearance Agreement Notice of Missed Payments." Veiluva wrote Levy that he had been informed that "Norris has made no payments since November 2007." He had sent Levy "the final revised two deeds of trust, with complete legal descriptions, that we needed [Norris] to sign for Stewart Title consistent with the forbearance agreement. I have not received these back." He concluded by stating that Norris was in default, and Stewart Title would be "forced to exercise its remedies as an assignee of the Equity Bancorp note."

On March 4, 2008, Levy emailed Veiluva and stated "I have been trying to reach [Norris] all day, without success . . . . I have no news. I have left him messages and e-mails demanding that he make contact, but still no word." Veiluva responded that given the "absence of payment or documentation, our instructions from the client are to foreclose." The following day, Levy emailed Veiluva that she had spoken with Norris; that there had been a miscommunication regarding making his payments to Stewart Title; and Norris would need until March 15 to cure the past due payments. As to the finalized deeds of trust, Levy represented that she had Norris's "original, notarized signatures on those two Deeds of Trust at [her] office now, but the text is so lightly printed . . . that I doubt the recorder will take them. I will fax to you what I have now so that you can see the problem. [Norris] is coming in tomorrow to re-execute and have my secretary notarize on good copies. Then, I will send the originals to you. [¶] Please confirm whether this arrangement is acceptable in order to avoid recordation of a NOD [notice of default] now."

5

Norris never provided the deeds of trust for the additional properties pledged as security.

In April 2008, Stewart Title recorded a notice of breach and default on the $1.8 million loan. On June 19, 2008, Norris's new attorney, Dena Thaler, wrote defendants' attorney requesting that defendants either reinstate the forbearance agreement and/or the amount necessary to cure the default on the underlying $1.8 million note. Defendants' counsel replied on June 26 that they were rejecting the request to reinstate the forbearance agreement or the note "due to the fact that [Norris'] breach of the forbearance agreement—and resulting reinstatement of the terms of the note—has caused the note to accelerate, leaving the entire unpaid principal balance plus other fees and costs immediately due and owing."

A notice of trustee's sale was recorded as to the Sparks Property on September 3, 2008. Norris tried to prevent the foreclosure by filing a motion in the Equity Funding Litigation in April 2009 for a temporary restraining order and preliminary injunction. As part of this motion, Norris declared that he was "told that if I paid $400,000 toward the loan and kept up certain payments, that Equity Bancorp would not foreclose on the collateral. In reliance on this promise, I made the $400,000 payment." This motion was denied.

Stewart Title's foreclosure of the Sparks Property was delayed by Norris's three separate bankruptcy filings in September 2008, December 2008, and January 2009. A new notice of trustee's sale was recorded in April 2009. Following the foreclosure, Norris filed a motion in the Equity Funding Litigation for an injunction requiring that Equity Bancorp either reimburse Norris the $400,000 he paid under the forbearance agreement or transfer legal title to the Sparks Property to Norris and his co-owner. This motion also was denied.[5]

---

[5] Norris asks us to take judicial notice of various documents that were filed in connection with Norris's requests for injunctive relief in the Equity Funding Litigation, including two special verdict forms. Three of the documents appear already to be in the record: the June 2010 notice of motion for an injunction, the Declaration of Steven Norris

6

Norris filed this lawsuit on August 30, 2010, alleging two causes of action: Equity Bancorp's use of the $400,000 to pay down the principal balance of the $1.8 million loan violated the "one action" rule of section 726, and, based on these allegations, defendant had been unjustly enriched. He also alleged that because he did not deliver the two additional deeds of trust, the forbearance agreement never took effect, relying on the provision of that agreement regarding effectiveness, described above.

Defendants moved for summary judgment on multiple grounds. Defendants argued that there was no section 726 violation because Norris's $400,000 payment was a voluntary payment towards the principal balance of the $1.8 million loan in exchange for forbearance from foreclosure. Defendants also argued that the forbearance agreement was effective notwithstanding Norris's failure to provide the additional security, offering three separate reasons: (1) The condition precedent that Norris provide additional security was solely for defendants' own benefit and could thus be waived by defendants; (2) Norris had partially performed under the forbearance agreement by paying $400,000, and thus the contract could not be nullified; or (3) that Norris had ratified the forbearance agreement by failing to object to the application of the $400,000 to his loan balance and by continuing to assure defendants that he would provide the additional security, even after the October 1 closing date for the forbearance agreement.

in Support of his Motion for an Injunction, and the Declaration of Michael Veiluva in Opposition to Steve Norris' Motion for Turnover. Accordingly, judicial notice of these documents is unnecessary. The other documents, however, were never placed before the trial court although they existed at the time Norris filed his opposition to defendant's summary judgment motion. "As a general rule, documents not before the trial court cannot be included as part of the record on appeal and thus must be disregarded as beyond the scope of appellate review. [Citations.] Likewise disregarded are statements in briefs based on matter improperly included in the record on appeal." (*Pulver v. Avco Financial Services* (1986) 182 Cal.App.3d 622, 632.) Additionally, "[r]eviewing courts generally do not take judicial notice of evidence not presented to the trial court. Rather, normally 'when reviewing the correctness of a trial court's judgment, an appellate court will consider only matters which were part of the record at the time the judgment was entered.' " (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn.3.) Norris has presented no "exceptional circumstances" to justify deviating from these general rules. (*Ibid.*) Norris's request for judicial notice is denied.

After a hearing, the court granted defendants summary judgment. As to the first cause of action asserting a violation of section 726, the court found that "Plaintiff made his $400,000 payment voluntarily, and that amount was not taken unilaterally by Equity Bancorp as a setoff or in an attempt to pursue Plaintiff personally prior to foreclosure." As to the second cause of action for unjust enrichment, the court stated that "Plaintiff contends that Equity Bancorp was unjustly enriched because it kept both the money and the property, in violation of the law. However, that contention has been shown to lack merit."

## STANDARD OF REVIEW

A motion for summary judgment "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (§ 437c, subd. (c).) A defendant moving for summary judgment has the initial burden of showing either that one or more elements of the cause of action cannot be established or that there is a complete defense. (§ 437c, subd. (p)(2).) If the initial burden is met, the burden shifts to the plaintiff to show the existence of a triable issue of fact with respect to that cause of action or defense. (§ 437c, subd. (p)(2); see *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850-853 (*Aguilar*).) [6] "There is a triable issue of material fact if, and only if, the evidence would

---

[6] Norris's Response to Separate Statement of Facts filed in opposition to summary judgment does not comply with California Rules of Court, rule 3.1350(f), which states in part: "Each material fact claimed by the moving party to be undisputed *must be set out verbatim* on the left side of the page, *below which* must be set out the evidence said by the moving party to establish that fact, *complete with the moving party's references to exhibits.* . . . An opposing party who contends that a fact is disputed must state, on the right side of the page directly opposite the fact in dispute, the nature of the dispute and describe the evidence that supports the position that the fact is controverted." (Emphasis added.) By failing to comply with this simple rule, plaintiff required us and the trial judge to flip back and forth between multiple documents in the record, a cumbersome process that the rule was specifically designed to avoid. (See *Aguilar, supra,* 25 Cal.4th at p. 843 ["The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute."].)

8

allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar*, *supra*, 25 Cal.4th at p. 850.)

On appeal, " 'we take the facts from the record that was before the trial court when it ruled on that motion. [Citation.] " 'We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained.' " [Citation.] We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party. [Citation.]' [Citation.]" (*Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 716-717.)

## DISCUSSION

The parties focus the bulk of their arguments on appeal, as they did before the trial court, on whether the forbearance agreement was a valid and enforceable contract. However, like the trial court, we need not reach these issues.

A.    *Section 726 Claim*

In relevant part, section 726 provides that "[t]here can be but one form of action for the recovery of any debt or the enforcement of any right secured by mortgage upon real property . . . , which action shall be in accordance with the provisions of this chapter." (§ 726, subd. (a).) Under this so-called "one form of action" rule, a "secured creditor can bring only one lawsuit to enforce its security interest and collect its debt." (*Security Pacific National Bank v. Wozab* (1990) 51 Cal.3d 991, 997 (*Wozab*).) Included in the one form of action rule is the security-first principle, which "require[s] a secured creditor to proceed against the security before enforcing the underlying debt." (*Id.* at p. 999, citing *Walker v. Community Bank* (1974) 10 Cal.3d 729, 733-734 (*Walker*).)

A creditor who violates the security-first principle "by taking an improper extrajudicial setoff [is] held to have waived the bank's security interest in its depositor's real property" and is therefore precluded from foreclosing on that property. (*Wozab*, *supra*, 51 Cal.3d at pp. 1001-1002, 1005; see also *Walker*, *supra*, 10 Cal.3d at p. 740 ["[W]hen the Bank failed to include the real property and thereby failed to exhaust all

9

security before obtaining a deficiency judgment, it automatically triggered the sanction aspect of section 726 and thereby lost all security rights in the real property."].) The underlying debt remains valid, but creditors who violate the security first principle "los[e] their preferred position as secured creditors" and are "reduced to the status of unsecured creditors." (*Wozab*, *supra*, 51 Cal.3d at p. 1004.)

Norris argues that defendants violated the security-first principle by applying Norris's $400,000 to the underlying $1.8 million loan. Norris thus contends that the defendants waived their security interest in the Sparks Property and therefore lost the right to foreclose on that property. Norris relies primarily on our Supreme Court's decision in *Wozab*. In that case, the defendant bank extended a line of credit to a corporation secured by a deed of trust on Anton Wozab and his wife's personal residence. (*Wozab*, *supra*, 51 Cal.3d at p. 995.) (Anton Wozab was the president and shareholder of the corporation.) (*Ibid.*) The corporation and the Wozabs each had separate demand deposit and savings accounts with the defendant bank. (*Ibid.*) Eventually, the defendant bank became concerned that the corporation was going to file a bankruptcy petition. To reduce the corporation's debt, the bank unilaterally setoff the corporation's and Wozabs' demand deposit and savings accounts against the outstanding debt. (*Id.* at pp. 995-996.) The Supreme Court held that the setoff violated the security-first principle: "We reaffirm the long-standing rule that under section 726(a) the bank is not allowed to take a unilateral setoff of funds in a depositor's demand account against a debt secured by the depositor's interest in real property." (*Id.* at p. 1001.) As a result, the court held that the bank had waived its security interest in the Wozabs' residence. (*Id.* at p. 1004.)[7]

---

[7] The security-first principle has been applied outside of the bank setoff context. For example, in *Walker*, the California Supreme Court applied the security-first principle where a borrower secured a loan with both personal and real property. (*Walker*, *supra*, 10 Cal.3d at p. 732.) When the debtor defaulted, the creditor judicially foreclosed on the personal property and recovered a deficiency judgment against the debtor. (*Ibid.*) The creditor failed to include the real property in the foreclosure action. The court found that when there is a "single debt secured by both real and personal property and the creditor elects to judicially foreclose only on the personal property, he thereby loses his security interest in the real property as against all parties." (*Id.* at p. 741.)

10

The security-first principle does not apply under the circumstances of this case. Unlike in *Wozab*, the defendants in this case did not engage in a unilateral setoff. While the parties dispute whether the forbearance agreement ever took effect, it is undisputed that Norris voluntarily provided Equity Bancorp the $400,000 in an attempt to enter into the forbearance agreement to prevent foreclosure of the Sparks Property. At the time he made this payment, Norris fully intended the $400,000 to be applied to his outstanding loan balance as a "principal paydown." Norris does not dispute that Equity Bancorp applied the funds in this way, and he does not argue that he has not been fully credited this amount. Even if, as Norris argues, there was a failure of conditions that rendered the forbearance agreement void, this fact would not change the voluntary nature of the payment or the fact that the payment was meant to pay down the principal.[8]

We agree with the trial court that the decision of *Nungaray v. Litton Loan Servicing, LP* (2011) 200 Cal.App.4th 1499, is analogous to this matter. There, the Nungarays defaulted on an obligation secured by a deed of trust against their personal residence. (*Id.* at p. 1502.) After a notice of default and election to sell under the deed was recorded, the Nungarays attempted to negotiate a loan modification. (*Ibid.*) The Nungarays, but not the lenders, executed a "Loan Workout Plan" which provided that they would make "trial period payments" and provide documentation to the lenders to determine their eligibility for a loan modification. (*Id.* at pp. 1502-1504.) The Nungarays made four such payments but the lenders eventually notified them that the Loan Workout

_____

[8] In fact, even under Norris's reading of the agreement as not "effective," his $400,000 principal pay down was voluntary. As we have noted, Norris asserts that the forbearance agreement is "clear" or "plain" that the agreement never became effective by its terms. However, the full text of the provision upon which Norris primarily relies provides: "This Agreement shall become effective only upon the satisfaction of each of the conditions by Borrower as listed below *on or before October 1, 2007* (the 'Closing'). In the event that Borrower fails to meet any of the following Conditions *on or before the Closing*, this Agreement shall have no effect and shall be void . . . ." (Emphases added.) Norris does not dispute, however, that he made the $400,000 payment on or about October 8, 2007. By October 8, under Norris's strict reading of the forbearance agreement, the forbearance agreement had already been "void" and of "no effect" for a week.

11

Plan was being terminated and foreclosure proceedings would resume. (*Id.* at p. 1503.) The lenders did not return two of the Nungarays' trial period payments. After foreclosure, the Nungarays sued, claiming that the lenders' failure to return the trial period payments violated section 726. (*Id.* at p. 1505.) The court affirmed the trial court's finding that there was no section 726 violation. It found that the Nungarays had "voluntarily paid monthly payments during the [Loan Workout] Plan period in hopes of obtaining a loan modification after Litton and the Bank reviewed their financial information and declaration of financial hardship. In exchange Litton and the Bank suspended further foreclosure proceedings for approximately six months. We do not consider the payments a set-off manifesting an election to not foreclose pursuant to the one-form of action rule of 726." (*Id.* at pp. 1505-1506.)

Like the Nungarays, Norris made a voluntary payment to defendants in contemplation of forestalling foreclosure proceedings. The trial court correctly determined that defendants were entitled to summary judgment on Norris's section 726 claim. In light of this holding, we need not address the parties' arguments regarding the effectiveness of the forbearance agreement.

B. *Unjust Enrichment*

"Unjust enrichment is not a cause of action, just a restitution claim." (*Hill v. Roll International Corp.* (2011) 195 Cal.App.4th 1295, 1307.) Where there is no actionable wrong, there is no basis for the relief. (*Ibid.*)

Norris's unjust enrichment claim is entirely derivative of his first cause of action asserting a violation of section 726. He realleged all of the allegations related to the section 726 claim by reference and then alleged: "Equity Bancorp has been unjustly enriched at the expense of Mr. Norris." Norris reinforced the connection between the section 726 claim and the unjust enrichment claim in his opposition to defendants' summary judgment motion when he argued "Equity Bancorp was unjustly enriched because Equity Bancorp kept both the money and the property, in violation of the law." The only "violation of the law" Norris alleged was section 726. Accordingly, once the

12

trial court determined that defendants had not violated section 726, it properly granted defendants summary judgment on the unjust enrichment claim.

For the first time in his reply brief before this court, Norris contends that the trial court's grant of summary judgment prevented him from "establishing that the fair market value of the foreclosed properties satisfied the loan and the bank benefited by an additional $400,000." He also argues that the "hands of these respondents is to say the least unclean" and that he was "denied the opportunity to prove [his] case." Neither the "unclean hands" nor "fair market value" theory of unjust enrichment was raised before the trial court or in Norris's opening brief before this court. Accordingly, Norris has waived these arguments. (*Sea & Sage Audubon Society, Inc. v. Planning Com.* (1983) 34 Cal.3d 412, 417 ["As a general rule, 'issues not raised in the trial court cannot be raised for the first time on appeal.' "]; *Habitat and Watershed Caretakers v. City of Santa Cruz* (2013) 213 Cal.App.4th 1277, 1293, fn. 6 ["Arguments presented for the first time in an appellant's reply brief are considered waived."].)[9]

## DISPOSITION

The judgment is affirmed.

---

[9] Before the trial court, Norris requested a continuance pursuant to section 437c, subdivision (h) to permit additional discovery. The trial court denied this request on the ground that Norris had failed to submit a declaration showing that facts justifying opposition existed but could not then be presented. Norris's request for a continuance related to questions of waiver and not to either the fair market value of the Sparks Property or any alleged unclean hands issues. Norris did not appeal the trial court's denial of his request for a continuance.

_____
Miller, J.

We concur:


_____
Richman, Acting P.J.


_____
Stewart, J.


A136185, *Norris v. Equity Bancorp, Inc., et al.*

14